**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
ABRAMS, FENSTERMAN, FENSTERMAN,
EISMAN, GREENBERG, FORMATO & EINIGER, LLP,

                              Case No.: CV 11 0665
                                    (JW) (MJW)

                      Plaintiff,

                                      **AMENDED VERIFIED**
    -against-                                  **COMPLAINT**

UNDERWRITERS AT LLOYD'S, LONDON,

                      Defendant.
-------------------------------------------------------------------X

       Plaintiff, Pro Se, as and for its Amended Verified Complaint to obtain a judgment herein

declaring the rights and legal relations of the parties to this action and in the respects hereinafter set

forth, and for the other relief sought herein, alleges as follows:

### AS AND FOR A FIRST CAUSE OF ACTION

    1.      That at all times hereinafter mentioned, Plaintiff, ABRAMS, FENSTERMAN,

FENSTERMAN, EISMAN, GREENBERG, FORMATO & EINIGER, LLP ("ABRAMS,

FENSTERMAN"), was and still is a limited liability partnership, engaged in the practice of law, with

its principal place of business located in Lake Success, New York.

    2.      That at all times hereinafter mentioned, upon information and belief, Defendant,

UNDERWRITERS AT LLOYD'S, LONDON, was and still is an entity authorized and licensed in

the State of New York to do business as an insurance company, with offices located throughout the

world, including but not limited to New York, New York.

    3.      That at all relevant times hereinafter mentioned, Howard Fensterman was and still

is, and Robert Abrams was, a partner in ABRAMS, FENSTERMAN.

4.      Defendant is the insurer that has provided lawyer's professional liability insurance to Plaintiff for various policy periods, including but not limited to policy period January 1, 2010 through January 1, 2011, under policy number B0738HI003000E.

5.      This Court has jurisdiction over the parties, and there is a justiciable case and controversy regarding the rights and obligations as between Plaintiff and Defendant with respect to the duty to defend Plaintiff in actions brought as follows:

> a)      Jan Burman, Steven Krieger and Scott Morrell v. American Gulf Management Company, LLC, Michael J. Weinberg, Howard Fensterman, Amer Rustom, Azzam Rustom, Mitchell Pollack, M.D., Wyche Fowler, Jr., Spencer Abraham, Gateway Insurance LLC, David Stanton, E. Luis Campano, The Platinum Group USA, Inc., Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP, Anachnu, LLC, JordStac, LLC and American Gulf Insurance Company, LLC., which action is pending in the Chancery Court, State of Delaware, having been commenced on or about June 7, 2010 (the "Burman Matter"); and

> b)      Scott Morrell and Roselee Morrell v. The Golden Goslings, Inc. d/b/a Myziva, MZ Consulting Company, LLC, MZ National, LLC, Robert Abrams, Howard Fensterman, Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP, which action is pending in the Supreme Court of the State of New York-County of Nassau, having been commenced on or about August 25, 2010 (the "Morrell Matter").

6.      The Plaintiffs in the Burman Matter have alleged **inter alia**, professional malpractice and/or negligence and breach of contract on the part of the Plaintiff and its managing partner, Howard Fensterman.  A copy of the Complaint in the Burman Matter is annexed hereto as Exhibit "A", and is incorporated herein by reference.

7.      The Plaintiffs in the Morrell Matter have alleged **inter alia**, professional malpractice and/or negligence on the part of the Plaintiff and its managing partner, Howard Fensterman, and former partner, Robert Abrams.  A copy of the Complaint in the Morrell Matter is

annexed hereto as Exhibit "B", and is incorporated herein by reference. A copy of the Amended Complaint in the Morrell Matter is annexed hereto as Exhibit "C", and is incorporated herein by reference.

8.     This declaratory judgment action seeks declarations of coverage by this Court with respect to Defendant's obligation(s) to provide a defense and indemnity coverage to Plaintiff and its partners and principals, and Plaintiff's right to receive a defense and indemnity coverage with respect to the claims asserted in the Burman Matter and the Morrell Matter.

9.     Plaintiff provided timely notice to Defendant about the service of the Complaints by notice to Defendant's authorized and designated representative. Plaintiff has demanded from Defendant an unqualified defense and complete indemnity coverage in the Burman Matter and the Morrell Matter.

10.     Plaintiff has complied with all conditions and obligations under the subject insurance policy with respect to its rights to a defense and to indemnity in the Burman Matter and the Morrell Matter.

11.     On or about October 21, 2010, Defendant advised Plaintiff in writing that, in Defendant's opinion, there is no coverage under the policy for the claims asserted in the Burman Matter and the Morrell Matter. A copy of Defendant's written denials of coverage to Plaintiff are attached to this Complaint as Exhibits "D" and "E" respectively, and are incorporated herein by reference.

12.     An actual and justiciable controversy exists concerning the rights, duties and obligations of the parties arising out of the terms and conditions of the policy described in paragraph "4" of this Complaint.

-3-

## AS AND FOR A SECOND CAUSE OF ACTION

13.     Plaintiff repeats and reiterates each and every allegation contained in paragraphs "1" through "12" of this Complaint, as if more fully set forth at length hereat.

14.     There exists a valid and binding contract between Plaintiff and Defendant requiring Defendant to provide insurance coverage and related services to Plaintiff.

15.     Plaintiff has performed all obligations on its part pursuant to the Contract between the parties.

16.     Defendant has failed to perform the obligations on its part under the Contract between the parties, and as a result, is in breach of same.

17.     That solely as a result of Defendant's breach of contract as aforesaid, Plaintiff has been damaged in an amount to be determined by the Court, but in any event, not less than an amount exceeding the jurisdictional limits of all lower Courts.

## AS AND FOR A THIRD CAUSE OF ACTION

18.     Plaintiff repeats and reiterates each and every allegation contained in paragraphs "1" through "17" of this Complaint, as if more fully set forth at length hereat.

19.     That Defendant has acted in a manner that deprives Plaintiff of its right to receive the benefits under the agreement between the parties.

20.     That the actions of the Defendant as aforesaid constitute a breach of the implied covenant of good faith and fair dealing inherent in the parties' Agreement.

21.     That as a result of Defendant's breach of the implied covenant of good faith and fair dealing as aforesaid, Plaintiff has been damaged in an amount to be determined by the Court, but in any event, not less than a sum exceeding the jurisdictional limits of all lower Courts.

-4-

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment:

1. On its First Cause of Action, declaring that the policy described in paragraph "4" of this Complaint provides coverage for the claims made against Plaintiff in both the <u>Burman Matter</u> and the <u>Morrell Matter</u>;

2. On its First Cause of Action, Declaring that Defendant is liable to pay all sums for the defense of Plaintiff with respect to the claims presented in the <u>Burman Matter</u> and the <u>Morrell Matter</u>, and that Defendant's duty to defend continues until final resolution of the claims made against Plaintiff in the <u>Burman Matter</u> and the <u>Morrell Matter</u>;

3. On its First Cause of Action, declaring that Defendant is liable to pay all sums necessary to fully indemnify Plaintiff for any damages, costs or expenses that Plaintiff is required to pay with respect to the claims presented in the <u>Burman Matter</u> and the <u>Morrell Matter</u>;

4. On its Second Cause of Action, in an amount to be determined by the Court, but in any event, not less than a sum exceeding the jurisdictional limits of all lower courts;

5. On its Third Cause of Action, in an amount to be determined by the Court, but in any event, not less than a sum exceeding the jurisdictional limits of all lower courts;

6. Awarding Plaintiff its attorneys' fees, along with costs and disbursements of suit; and

7. Granting Plaintiff such other and further relief as the Court deems just, proper and equitable.

Dated: Lake Success, New York
   February 17, 2011

      Yours,
      ABRAMS, FENSTERMAN, FENSTERMAN,
      EISMAN, GREENBERG, FORMATO &
      EINIGER, LLP

      By: _____
        Keith J. Singer, Esq.
      Plaintiff Pro Se
      Pursuant to NYCRR 130-1.1a
      1111 Marcus Avenue - Suite 107
      Lake Success, New York 11042
      (516) 328-2300

TO:    Frederick J. Wilmer, Esq.
           Kissel, Hirsch & Wilmer
           Attorneys for Defendant
           580 White Plains Road
           5th Floor
           Tarrytown, New York 10591
           (914) 750-5933

**VERIFICATION**

STATE OF NEW YORK    )
                               ) :ss
COUNTY OF NASSAU     )

        The undersigned, being duly sworn, deposes and says:

        1.  I am a partner in the Plaintiff limited liability partnership in the within action.

        2.  I have read the document referred to below.

        3.  I know the contents of same to be true to my own knowledge, except those matters which are stated to be alleged on information and belief, and as to those matters, I believe them to be true.

Document being verified:    **AMENDED COMPLAINT**

                                                  **Howard Fensterman**
                                                **Managing Partner**

Sworn to before me this
17th day of February, 2011

Notary Public

**KEITH J. SINGER**
**Notary Public, State of New York**
**No. 30-4961171**
**Qualified in Nassau County**
**Commission Expires January 22, 2014**

-7-

EXHIBIT "A"

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

```
-----------------------------------------------------------  X
JAN BURMAN, STEVEN KRIEGER and                               :
SCOTT MORRELL,                                               :
                                                            :
                    Plaintiffs,                             :        C.A. No._____
                                                            :
        -against-                                           :
                                                            :
AMERICAN GULF MANAGEMENT COMPANY, LLC,                       :
MICHAEL J. WEINBERG, HOWARD FENSTERMAN,                      :
AMER RUSTOM, AZZAM RUSTOM, MITCHELL                          :
POLLAK, M.D., WYCHE FOWLER, JR., SPENCER                     :
ABRAHAM, GATEWAY INSURANCE, LC, DAVID                        :
STANTON, E. LUIS CAMPANO, THE PLATINUM                      :
GROUP USA, INC., ABRAMS, FENSTERMAN,                         :
FENSTERMAN, EISMAN, GREENBERG, FORMATO &                     :
ENIGER, LLP, ANACHNU, LLC, JORDSTAC LLC and                  :
AMERICAN GULF INSURANCE COMPANY, LLC,                        :
                                                            :
                                                            :
                    Defendants.                             :
-----------------------------------------------------------  X
```

## VERIFIED COMPLAINT

Plaintiffs, Jan Burman, Steven Krieger and Scott Morrell (collectively, "Plaintiffs") by and through their attorneys Jaspan Schlesinger LLP, as and for their Verified Complaint, allege as follows:

## NATURE OF THE ACTION

1.      This action arises out of defendants' fraudulent scheme to induce Plaintiffs to invest into a Delaware limited liability company based on false representations that Plaintiffs' funds would be invested as promised.  Defendants' misappropriated Plaintiffs' funds for their own benefit and at Plaintiffs' expense and concocted an absurd story that Plaintiffs' funds were stolen by members of a Royal Family in Dubai.  In doing so, Defendants have, *inter alia*,

breached their fiduciary duties, committed fraud, malpractice and breach of contract causing substantial damages to Plaintiffs.

2.     Plaintiffs were induced by Defendants to invest over $1.6 million in American Gulf Insurance Company, LLC ("AGIC"), whose primary business purpose was to underwrite and sell personal and commercial insurance coverage. Defendants have not only failed to invest Plaintiffs' funds as promised, but failed to account for those funds. Defendants have not offered any reasonable explanation as to the misappropriation of Plaintiffs' funds which were supposed to be maintained in AGIC's bank account.

3.     In fact, some of the Defendants admit that they breached their duties to Plaintiffs which resulted in the misappropriation of approximately $18 million of AGIC funds, including Plaintiffs' investments.

4.     For the reasons contained herein, Plaintiffs are entitled to compensatory and punitive damages against Defendants in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with treble damages and interest, plus the costs and expenses of this action, including attorneys' fees and disbursements.

## THE PARTIES

5.     At all relevant times, plaintiff Jan Burman ("Burman") is an individual residing in the State of New York who has, upon information and belief, a 1.9% interest in AGIC.

6.     At all relevant times, plaintiff Steven Krieger ("Krieger") is an individual residing in the State of New York who has, upon information and belief, a .25% interest in AGIC.

7.     At all relevant times, plaintiff Scott Morrell ("Morrell") is an individual residing in the State of New York who has, upon information and belief, a 1% interest in AGIC.

D703350v2

8.      Defendant American Gulf Management Company, LLC ("AGMC") is a Delaware limited liability company with its principal place of business located at 1111 Marcus Avenue, Suite 107, Lake Success, New York 11042.  AGMC is the Manager of AGIC.  AGMC and its members are collectively referred to as "AGMC".

9.      Upon information and belief, Michael J. Weinberg ("Weinberg") is the Managing Member of AGMC and holds a 25% interest in AGMC.  Weinberg is a founding Member, Managing Director, President and Chief Executive Officer of AGIC.  Weinberg is also a Managing Director and partner of defendant Gateway Insurance, L.C.

10.      Upon information and belief, Howard Fensterman ("Fensterman") is a duly licensed New York attorney and Managing Partner of defendant Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP.  Fensterman is a Member of AGMC and holds a 25% interest in AGMC.  Fensterman is also a founding Member and Managing Director of AGIC.

11.      Upon information and belief, Amer Rustom ("AM Rustom") is a Member of AGMC and holds a 25% interest in AGMC.  AM Rustom is a founding Member and Managing Director of AGIC.  AM Rustom is also the President and Chief Executive Officer of defendant The Platinum Group USA, Inc.

12.      Upon information and belief, Azzam Rustom ("AZ Rustom") is a Member of AGMC and holds a 25% interest in AGMC.  AZ Rustom is a founding Member and Managing Director of AGIC.  AZ Rustom is also the Chief International Relations Officer and Vice-President of defendant The Platinum Group USA, Inc.

13.      Weinberg, Fensterman, AM Rustom and AZ Rustom are collectively referred to as the "Majority Members" of AGMC and AGIC.

D703350v2

14.    Upon information and belief, Mitchell Pollak, M.D. ("Pollak") is a Medical Claims Director of AGIC.

15.    Upon information and belief, Wyche Fowler, Jr. ("Fowler") is a Managing Director for Governmental Affairs for AGIC.

16.    Pollack and Fowler are collectively referred to as the "Director Defendants".

17.    Upon information and belief, Spencer Abraham ("Abraham") is a Special Advisor to AGIC.

18.    Upon information and belief, Gateway Insurance Company, L.C. ("Gateway") is a Florida limited liability company with its principal place of business located at 2430 West Oakland Park Boulevard, Fort Lauderdale, Florida 33311.

19.    Upon information and belief, David Stanton ("Stanton") is a founding Member of AGIC, with a 1% convertible interest, and Managing Director and partner of defendant Gateway.

20.    Upon information and belief, E. Luis Campano ("Campano") is a founding Member of AGIC, with a .666% convertible interest, and Managing Director and partner of defendant Gateway.

21.    Upon information and belief, The Platinum Group USA, Inc. ("Platinum") is a Delaware corporation, with its principal place of business located at 75 N. Congress Avenue, Delray Beach, Florida 33445.

22.    Upon information and belief, Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP (the "Abrams Firm"), is a limited liability partnership, with its principal place of business located at 1111 Marcus Avenue, Suite 107, Lake Success, New York 11042. Fensterman is a managing partner of the Abrams Firm. It is believed that several partners of the Abrams Firm have an interest in AGIC.

D703350v2

- 4 -

23.    Defendant American Gulf Insurance Company, LLC ("AGIC") is a Delaware limited liability company, with its principal place of business located at 1111 Marcus Avenue, Suite 107, Lake Success, New York 11042.

24.    Upon information and belief, Anachnu, LLC ("Anachnu") is a Florida limited liability company, with its principal place of business located at 6570 Landings Court, Baca Raton, Florida 33496. Upon information and belief, Anachnu is a founding Member of AGIC and Weinberg is a principal of Anachnu.

25.    Upon information and belief, Jordstac, LLC ("Jordstac") is a New York limited liability company, with its principal place of business located at 1111 Marcus Avenue, Suite 107, Lake Success, New York 11042. Upon information and belief, Jordstac is a founding Member of AGIC and Fensterman is a principal of Jordstac.

26.    Fensterman, Weinberg, AM Rustom, AZ Rustom, Stanton, Campano, Anachnu and Jordstac, are collectively referred to as the "Founding Members".

27.    AGMC, Weinberg, Fensterman, AM Rustom, AZ Rustom, Pollak, Fowler, Abraham, Gateway, Stanton, Campano, Platinum, the Abrams Firm, Anachnu, Jordstac and AGIC, are collectively referred to as "Defendants."

## FACTS COMMON TO ALL CAUSES OF ACTION

### Background

28.    In or around August 2007, defendant Weinberg circulated a business opportunity to potential investors (the "Prospectus"), including plaintiff Morrell, to invest in a company called Gateway Insurance International LLC ("GII"). See Exhibit "A". The purpose of the Prospectus was to create a de novo "insurance holding company formed in the State of Delaware which in turn will have two operating subsidiaries that will (a) underwrite and sell both personal

and commercial automobile insurance on a direct basis and (b) start a commercial insurance brokerage firm initially in the United Arab Emirates and branching out to other countries in the Arab Gulf Cooperation Council (AGCC) as soon as possible." See Exhibit "A".

29.     The Prospectus provided that GII will be owned collectively by a U.S. investor group led by Gateway, Weinberg and an AGCC investor group to include Platinum, Sheikh Faisal Al-Humoud Al-Malek Al-Sabah, the President of the AGCC, Sheikh Suleiman Al-Yanya of Oman, Sheikh Salen of Abu Dhabi and Fensterman. See Exhibit "A".

## The Majority Members Induce Plaintiffs to Invest in AGIC

30.     Defendants Fensterman and the Abrams Firm have represented each of the Plaintiffs for approximately ten years including all relevant time periods herein.

31.     Fensterman and the Abrams Firm served as Plaintiffs' counsel in various business ventures providing both transactional and litigation support and advice on corporate matters.

32.     On or about October 2007, defendant Fensterman solicited Plaintiffs to purchase membership interests in AGIC.

33.     Fensterman represented that AGIC would be created to operate as an insurance company in the United Arab Emirates ("UAE").

34.     Fensterman further stated that he had partnered with Weinberg, who he described as having significant and relevant experience in the insurance industry, as well as AM Rustom and AZ Rustom, who, Fensterman explained, had close ties in the UAE that would facilitate AGIC's operations and licensing requirements.

35.     Fensterman further explained that Fowler was serving as AGIC's Director for Governmental Affairs and, as such, would facilitate and coordinate AGIC's interaction with the UAE government and the governments of the other AGCC countries.

36.     Plaintiffs relied upon Fensterman and the Abrams Firm for legal advice and counsel with respect to investing in AGIC.

37.     Upon information and belief, in or around November 2007, Fensterman and Weinberg purportedly travelled to the UAE to explore potential business opportunities for AGIC. Fensterman reported to Plaintiffs, and other potential AGIC investors, that AGIC enjoyed the support of several influential individuals in Dubai, including members of the Royal Family, who Fensterman claimed promised to direct significant business to AGIC. Fensterman further stated that AGIC "will be starting off with very significant premiums income" and that "all that had been represented to [him] prior to [his] trip is 100% accurate." Fensterman represented that each of Plaintiffs financial commitments must be in Fensterman's escrow account maintained in the name of his law firm, the Abrams Firm, no later than December 7, 2007. Fensterman's representations are attached hereto as Exhibit "B".

38.     Fensterman further represented to Plaintiffs' that their investment was going to be maintained in a separate AGIC account and was to only serve as collateral to show the UAE government that AGIC had sufficient assets for the issuance of an insurance license. Fensterman explicitly represented to Plaintiffs that their investments would not be used for any other purpose.

39.     Fensterman represented to Plaintiffs that $13.5 million of AGIC's funds could never be used by AGIC for operating expenses. He explained that the Securities and Exchange Commission required those monies to be kept as a reserve for insurance claims. Thus, according to Fensterman, 75% of the approximately $18 million that was invested in AGIC had no risk.

D703350v2

40.     Fensterman also promised that by December 14, 2007, he would circulate AGIC's formation documents which would memorialize each of Plaintiffs' investments.  See Exhibit "C".

41.     On December 6, 2007, plaintiff Morrell, in reliance on Fensterman's representations, wired $500,000.00 from his account into the Abrams Firm's IOLA.  See Exhibit "D".

42.     On December 10, 2007, Burman, in reliance on Fensterman's representations, wired $275,000.00 from his account to the Abrams Firm's IOLA.  See Exhibit "E".

43.     On December 12, 2007, Krieger, also in reliance on Fensterman's representations, wired $125,000.00 from his account into the Abrams Firm's IOLA.  See Exhibit "F".

44.     By email dated January 11, 2008, Fensterman informed Plaintiffs that AGIC was not going to be issued as a private entity, as initially represented, but rather would be offered through an Initial Public Offering ("IPO") in the UAE.  Fensterman explained the change as an "opportunity [with] potential tremendous upside benefits for our entire group."  See Exhibit "G".

45.     By email dated February 19, 2008, Fensterman informed Plaintiffs that AGIC received its insurance brokerage license and was expected to obtain its underlying license to operate as an insurance company by May 1, 2008.  Fensterman further stated that "at the request of Sheikh Salene," AGIC would be offered publicly on the Dubai Exchange in or around May 1, 2009.  See Exhibit "H".

46.     On or about May 9, 2008, Fensterman circulated letters that he allegedly sent to Weinberg stating that AGIC's planned subsidiary would serve as "Broker of Record" for multiple companies located both within and outside of the UAE, including a new refinery in

D703350v2

- 8 -

Russia. Fensterman further represented in the letters that AGIC "was in the process of becoming licensed to do business in Russia." See Exhibit "I".

47.     It is believed that these representations were false and that AGIC has never obtained its insurance license, or any other license required to operate as an insurance company in the UAE.

48.     It is further believed that Fensterman's representations relating to AGIC's alleged plan to open an office in Russia were false and made for the purpose of inducing plaintiff Burman to invest further funds into AGIC with no intent to open an AGIC office in Russia.

**The Majority Members and AGMC**
**Failed to Timely Distribute the AGIC Materials**

49.     On or about July 8, 2008, approximately 7 months after Plaintiffs first transferred their funds to the Abrams Firm IOLA, Plaintiffs finally received the Private Offering Memorandum American Gulf Insurance Co., LLC (the "Private Offering Memorandum"). See Exhibit "J".

50.     The Private Offering Memorandum provides that AGIC is:

> to sell up to an aggregate of $17,875,000 of Investor membership interests ("Interests"), constituting a 35.75 percent interest in the Company, for a purchase price of $500,000 for each one percent interest. The offering of the Interests to Investors is referred to herein as the "Offering". The closing of the Offering is to occur as soon as practicable after the distribution of this Memorandum.

See Exhibit "J".

51.     The Private Offering Memorandum further provides that the net proceeds of the Offering are to be used as follows:

- Establishing a $12.5 million insurance loss and claim reserve;

- Paying $4.8 million for salaries, marketing and other start-up expenses;

- Paying $500,000 to acquire computers and software; and

- General corporate purposes.

See Exhibit "J".

52.     At no time did Plaintiffs' agree that their investments in AGIC were to be used for the payment of salaries.

53.     Upon information and belief, Weinberg took over $3.5 million as a purported salary, which was funded in part by Plaintiffs' investment, without Plaintiffs' permission or consent.

54.     Upon information and belief, Fensterman took 10% of Plaintiffs' investments as a fee, without Plaintiffs' permission or consent.

55.     Upon information and belief, the Director Defendants each drew a salary from AGIC, which was funded in part by Plaintiffs' investment, without Plaintiffs' permission or consent.

56.     Upon information and belief, the $500,000 designated to purchase computers and related software was misappropriated to the Majority Members and Defendants for their own personal benefit.

57.     The Private Offering Memorandum also provides that:

> The Company has formed Gateway Investments Limited, an entity organized in the UAE, in the Jebel Ali Free Zone ("Gateway Investments"), and will hold 100% of the beneficial interest in Gateway Investments. Gateway Investments is intended to initially beneficially own 100% of the ownership interests in American Gulf Insurance, a UAE public joint stock company ("AG Insurance"), formed to engage in the Insurance Business in the UAE. AG Insurance is currently being organized and is pursuing an UAE insurance license, which it expects to obtain within the next 60 days.

D703350v2

Under the current UAE law, AG Insurance will be required to offer 55% of its stock to the public through an offering conducted in the UAE. Immediately following the IPO, it is expected that the other 45% would be owned directly or indirectly by the Company, with 25% owned directly by Gateway Investments and 20% owned by Sheikh Salem, who is expected to assign his beneficial interest in this portion to Gateway Investments. Under present law, Gateway Insurance would be required to hold its shares for two years and would not be able to offer them in the public offering.

In addition to AG Insurance, the Company is forming an UAE entity to engage in the Brokerage Business (the "Insurance Broker"). Based upon the requirements of UAE law, Mr. Fareed Lufti will own a 51% interest in the Insurance Broker and the Company will own a 49% interest. The operating agreement governing the Insurance Broker, however, will provide that Mr. Lufti will be entitled to 20% of the profits of the Insurance Business after all expenses, but will assign all of his rights with respect to voting and distributions to the Company. The Brokerage Business is expected to bear all of the start-up costs of the Insurance Business and the Brokerage Business, and accordingly no profits are expected in the near term. Following the commencement of operation of the AG Insurance, it may be possible to phase-out the Insurance Broker and to conduct both the Insurance Business and the Brokerage Business through AG Insurance. The Insurance Broker is expected to begin business within the next few weeks.

See Exhibit "J".

58. Upon information and belief, AGIC did not form Gateway Investments Limited in the Jebel Ali Free Zone as required under the Private Offering Memorandum.

59. Upon information and belief, neither AGIC, nor its Majority Members or the Director Defendants, intended to offer stock in AG Insurance to the public.

60. The Private Offering Memorandum further states that:

In connection with the formation of the Company in December 2007, the Company issued Founder membership interests to its Founder and their affiliates. Currently these interests represent 100% of the Company's outstanding membership Interests.

In connection with this Offering, the Company is offering Investor membership interests that will constitute, upon completion of the

Offering, 35.75% of the outstanding membership Interests. The outstanding Founder membership Interests will represent the remaining 64.25% of the outstanding membership Interests.

See Exhibit "J".

61.     Upon information and belief, Defendants raised and accepted from investors more funds than were provided in the Offering and have issued interests in the purported entity in excess of 100% of the equity.

62.     Upon information and belief, the Founding Members' interest in AGIC was funded, in whole or in part, by Plaintiffs' investments.

63.     At no time did Plaintiffs' agree that their investments were to be used to fund, in whole or in part, the Founding Members' interest in AGIC.

64.     The Private Offering Memorandum incorporates by reference and attaches AGIC's Business Plan, dated May 20, 2009 (the "Business Plan") and the proposed Amended and Restated Limited Liability Company Operating Agreement (the "Operating Agreement").

65.     The Business Plan details AGIC's objectives which mirrors the Prospectus. See Exhibit "K".

66.     Specifically, the Business Plan provides at paragraph 1.1 that AGIC is:

> to create a *de novo* insurance holding company which in turn will have operating subsidiaries that will underwrite and sell (a) both personal and commercial automobile insurance on a direct basis; (b) a full line of personal insurance policies other than (at least initially) individual health and life insurance policies; and (c) a full line of commercial insurance (including employee benefits) initially in the United Arab Emirates and branching out to other countries in the Arab Cooperation Council (AGCC) as soon as possible.

See Exhibit "K".

67.     The Business Plan further states that AGIC:

D703350v2

- 12 -

expects that its relationships and ties established through its affiliation with The Platinum Group will be important to AGI's future success in the region. Amer and Azzam Rustom are founding principals and shareholders in AGI and their maternal grandfather was the Sultan of Lebanon. They have maintained relationships with their relatives within the various royal families throughout the region and these relatives have committed both their assistance and their business to this new venture. Not only will this help AGI develop immediate credibility, but it has already eased the way for organizing the business with less bureaucratic delays than one would otherwise experience.

See Exhibit "K".

68.    Paragraph 1.3 of the Business Plan, entitled "Keys to Success", provides, in pertinent part:

- Incorporation of proven creative marketing techniques that Gateway Insurance has used to successfully grow its U.S. domestic business into the marketing plan AGI has developed for the AGCC.

- State of the art automation systems.

- Concierge class claim service from the time of initial claim reporting to the time the claim is fully paid and closed, refined by over 55 years of experience in the U.S. markets.

- In-house marketing to minimize total commission expense.

- Relationships with the members of Royal Families and key business leaders in each market segment and country.

See Exhibit "K".

69.    Upon information and belief, Defendants neither implemented nor had any intention to implement any of the above "Keys to Success".

70.    Paragraph 2.2 of the Business Plan, titled "Milestones" states that as of the beginning of business by the Third Calendar Quarter of 2008, AGIC will have already:

- Identified the products that will be offered through both direct marketing and auto and brokerage subsidiaries;

D703350v2

- 13 -

- Identified markets within the AGCC that appear the most suitable for both product offerings;

- Established sponsorships by individuals who are assisting AGIC with obtaining the necessary business and insurance licenses;

- Identified targeted consumers within each of the AGCC markets for each of the identified product offerings;

- Secured the trademark and corporate name in the UAE;

- Engaged an attorney in the UAE to incorporate both subsidiary companies and handle regulatory matters;

- Met with the Ministry of Economy and Commerce—which is the regulatory authority for the insurance industry—to obtain the necessary approvals;

- Established the main corporate office in Dubai and identified possible office space in Kuwait and Abu Dhabi; and

- Obtained a commercial brokerage license.

See Exhibit "K".

71.    AGIC projected in the first twelve month period following the pre-opening period total revenue of $95.0 million from personal and commercial automobile insurance. See Exhibit "K", ¶ 7.2.

72.    The Majority Members represented that as market penetration increases in the second and third twelve-month-periods by one-and-one-half percent (1.5%) per year in the personal and commercial automobile and other personal insurance markets and one-and-one-half percent (1.5%) per year in the commercial insurance market, gross operating revenue increases to $330.6 million at the end of the second twelve-month-period and $662.4 million at the end of the third twelve-month-period. See Exhibit "K", ¶ 7.2.

73.    The Majority Members, the Director Defendants and AGMC have not only failed to perform their obligations under the Business Plan and the Private Offering Memorandum, but

D703350v2

had no intent to perform their obligations but rather misappropriate Plaintiffs' funds in the Abrams Firm IOLA for Defendants' own benefit and self-interest.

74.    The Operating Agreement was also attached to the Private Offering Memorandum. See Exhibit "L".

75.    The Operating Agreement states that AGIC was formed on or about December 6, 2007, as a Delaware limited liability company to: (i) underwrite and sell personal and commercial automobile insurance in the Middle East through wholly-owned or controlled foreign subsidiaries and other affiliated entities; and (ii) provide commercial insurance brokerage services in the Middle East through wholly-owned or controlled foreign subsidiaries and other affiliated entities. See Exhibit "L".

76.    Paragraph 3.1 of the Operating Agreement provides that AGMC, who are the Majority Members, shall be the Managing Member of AGIC. See Exhibit "L".

77.    AGMC's members are Fensterman, AM Rustom, AZ Rustom and Weinberg. Weinberg is the Managing Member of AGMC. See Exhibit "L".

78.    The Operating Agreement required the Majority Members and AGMC to:

    a.    report to its Members as required under paragraph 3.11;

    b.    maintain records as required under paragraph 3.13;

    c.    not to commingle funds (¶ 3.15);

    d.    make distributions and allocations as required under paragraph 5.2; and

    e.    maintain bank accounts as required under paragraph 9.2.

See Exhibit "L", ¶¶ 3.11; 3.13; 3.14; 3.15; 5.2 and 9.2.

79.    The Majority Members and AGMC have failed perform their obligations under the Operating Agreement.

D703350v2

- 15 -

**Defendants Breach their Fiduciary Duties and Commit Fraud**

80.     On or about July 11, 2008, Fensterman induced plaintiff Burman to wire to the Abrams Firm IOLA an additional $700,000.  See Exhibit "M".  Fensterman represented that the additional $700,000 would be used solely for the purpose of opening an AGIC office in Moscow, Russia.

81.     AGIC did not open an office in Moscow or Russia and it is believed that Fensterman never intended to open an AGIC office in Russia.

82.     On or about July 28, 2008, plaintiff Krieger, upon the advice of Fensterman, as his attorney, executed the American Gulf Insurance Company LLC Subscription Agreement for Investor Membership Interests, which was countersigned by Fensterman, on behalf of AGIC, on September 8, 2008.  See Exhibit "N"

83.     On or about August 2, 2008, plaintiff Burman, upon the advice of Fensterman, as his attorney, executed the American Gulf Insurance Company LLC Subscription Agreement for Investor Membership Interests, which was countersigned by Fensterman, on behalf of AGIC, on September 8, 2008.  See Exhibit "O".

84.     On or about August 13, 2008, plaintiff Morrell, upon the advice of Fensterman, as his attorney, executed the American Gulf Insurance Company LLC Subscription Agreement for Investor Membership Interests, which was countersigned by Fensterman, on behalf of AGIC, on September 8, 2008.  See Exhibit "P".

85.     On or about September 15, 2008, Fensterman sent the Plaintiffs a letter stating that the initial round of financing for AGIC had closed and that their respective subscriptions and investments were finalized.  See Exhibits "Q", "R", "S".

D703350v2

86. Upon information and belief, defendants Fensterman and the Abrams Firm, purposely delayed in depositing Krieger's funds and failed to provide him in a timely manner a Schedule K-1 reflecting his investment.

87. On December 6, 2008, Fensterman sent an email to Morrell representing that AGIC signed a deal with Aetna and was issued a letter of intent from the Dubai Health Care Ministry and awarded a deal under which AGIC would insure one million families and generate approximately $7 million to $8 million per year. See Exhibit "T".

88. Strikingly, on December 8, 2008, Fensterman stated that AGIC's insurance license was expected within the next two months, despite previous representations that it was going to be issued back in May 1, 2008. See Exhibit "U".

89. On January 23, 2009, Fensterman sent an email to Plaintiffs representing that AGIC had received initial approval of its insurance license and that a federal license would be issued within 60 days. Fensterman further represented that the terms for a three year deal with the Dubai Health Ministry in a joint venture with Aetna had been finalized and that cash flow would start in January and generate a minimum of $11,000,000 per year for AGIC. See Exhibit "V".

90. However, on April 12, 2009, Fensterman sent Morrell an email stating that AGIC could not engage in a joint venture with Aetna because Aetna purportedly did not have the correct license to engage in the joint venture. See Exhibit "W".

91. On April 19, 2009, Fensterman represented to Burman that AGIC's insurance license would be delivered within 48 hours, in direct contradiction to his previous representations that AGIC would have its insurance license by May, 2008 or even February, 2009. See Exhibit "X".

D703350v2

92.     On April 22, 2009, Fensterman, in response to Burman's request on the status of AGIC's insurance license, informed Burman that AGIC received "sign off" on its insurance license and that they were awaiting delivery of a formal letter. See Exhibit "Y".

93.     On April 29, 2009, Fensterman, again in response to Burman's request for an update, told Burman that AM Rustom expected the licensing documents by the end of the week. See Exhibit "Z".

94.     On May 18, 2009, Fensterman, in response to Burman's request for another update, represented to Burman that they have the license. See Exhibit "AA".

95.     On May 20, 2009, Fensterman again represented that AGIC received written approval to be licensed as an insurance company in the UAE, however, failed to provide any documentary evidence of AGIC's license approval. See Exhibit "BB".

96.     On July 9, 2009, Weinberg sent Burman an email representing that AGIC was "ready to go" and would commence business in October 2009. See Exhibit "CC".

97.     On July 30, 2009, Weinberg sent an email to Plaintiffs with an attached AGIC update, which provided that:

> By January 1, 2008, American Gulf Insurance had raised its initial capital based upon a valuation of US $60,000,000. The initial "friends and family" round of capital came at a time when there no absolute assurance that a license could be obtained. Since that time, many hallmarks have been achieved:
>
> - AGI assembled the most Royal corporate board ever assembled by any company in the history of the United Arab Emirates including our honorary chairman, Sheikh Nahyan, brother of the founder of the country and Minister of Higher Education. Our Board of Directors controls approximately 30% of the wealth in the country and we expect them to steer a large portion of the insurance business that they control to AGI. They will have a financial interest in doing so.

D703350v2

- 18 -

- *AGI was one of 57 companies with an insurance company license pending in the UAE and is the only company to actually be granted a new license.* Because the Royals have selected our company as the vehicle for their anticipated insurance business. The Royals and the government, through the Abu Dhabi Investment Authority, will own approximately 25% of the company. (Emphasis added).

- *Our IPO is scheduled for October 1, 2009. It is the only UAE IPO this year and we will be listed on the Abu Dhabi exchange.* We will raise an additional $22,000,000 through the IPO. The only IPO last year was Green Crescent (Health) Insurance Company and it was oversubscribed 70 times. In the prior year, IPO's were oversubscribed as much as 177 times. (Emphasis added).

- *The Dubai Government has publicly announced that American Gulf Insurance, through its wholly owned subsidiary Gateway Health Care, will manage (on a no risk basis) the new mandatory Dubai Health Plan in a joint venture with Aetna.* This is take place in 2010 and should generate a minimum of $20,000,000 annually in net profits for AGI. (Emphasis added).

- *The UAE government has signed a Memorandum of Understanding granting AGI the exclusive right to provide insurance for all condos under a new mandatory law to be effectuated by the UAE government.* A pre-cursor to the law being enacted is a need for AGI to raise $450-500,000,000 capital to assure that it can handle all of the risk (along with reinsurance). We expect the annual profits to AGI, as sharing with a funding partner, to be well in excess of one billion dollars annually. Currently we are in talks with several major investors who are seriously interested in providing this capital. We expect a commitment for this capital no later than August 31, 2009. (Emphasis added).

- *We have reached an agreement in principle with XN Financial of Canada to "front" their Middle East insurance business on a no risk, fee basis.* (Emphasis added).

<u>See</u> Exhibit "DD".

D703350v2

98.     Upon information and belief, these representations were false and misleading in that none of the forgoing that Weinberg reported actually occurred or materialized.

99.     Upon information and belief, Fowler did not facilitate the issuance of AGIC's license to issue insurance.

100.    In October 2009, Burman contacted Fensterman to withdraw his funds after Burman travelled to Dubai and observing AGIC's purported offices to be essentially vacant.

101.    In response to Burman's request, Fensterman stated that "I can't give you your money back. We recently found out that the investment money is missing."

102.    Neither Fensterman nor any of the Defendants have offered any reasonable explanation as to the disappearance of Plaintiffs' funds or why the loss was only disclosed after Burman requested the return of his investment.

103.    Even more opprobrious is that the Defendants waited until December 7, 2009, to inform Morrell of the missing funds.

**The Majority Members, AGMC, the Founding Members**
**and the Director Defendants Continue to Breach their Fiduciary Duties**

104.    Fensterman alleged that he was investigating the purported theft of Plaintiffs' funds.

105.    On December 10, 2009, Burman sent Fensterman an email inquiring as to the status of the investigation and whether he had reviewed AGIC's bank records to determine the circumstances surrounding the unauthorized withdrawal. See Exhibit "EE".

106.    On December 21, 2009, Fensterman responded to Burman stating that he was waiting to hear back from the United States Ambassador to the Middle East before proceeding to the next step and that he would wait until January 2, 2010. See Exhibit "FF".

D703350v2

107.    By e-mail dated January 2, 2010, Fensterman represented to Burman that he had a meeting with AM Rustom, Weinberg, and Robert Fensterman, Fensterman's brother and a partner at the Abrams Firm, and would get back to him within the week as to the status of the "investigation". See Exhibit "GG". Fensterman did not follow-up with his purported contact with the United States Ambassador to the Middle East.

108.    On January 11, 2010, Burman sent an email to Weinberg and Fensterman expressing his frustration and concern about the lack of communication regarding the loss of Plaintiffs' funds and requested copies of AGIC's bank account information maintained at Union National Bank. See Exhibit "HH".

109.    Despite Burman's demand, the Majority Members, AGMC, the Founding Members and the Director Defendants refused to provide him with any of AGIC's bank account information.

110.    Then, in direct contradiction to multiple previous representations, on February 4, 2010, Fensterman sent plaintiff Morrell an email admitting that AGIC never received its license to write personal and commercial insurance. See Exhibit "II".

111.    It is believed that the Majority Members, the Director Defendants and AGMC had no intent to pursue any purported investigation of the funds misappropriated from AGIC's bank account and that the alleged "investigation" was further cover-up of Defendants' misappropriation of Plaintiffs' funds for their own benefit.

112.    Finally, it is also believed that Weinberg was using Plaintiffs' funds to travel throughout Europe and the Middle East to engage other business ventures such as a MRI company and a health care business, which he did not offer to Plaintiffs.

## AS AND FOR A FIRST CAUSE OF ACTION
(Breach of Fiduciary Duty-As Against the Majority Members,
the Founding Members, the Director Defendants & AGMC)

113.   Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

114.   The Majority Members, the Founding Members and the Director Defendants were all either members, directors and/or officers of AGIC and/or AGMC who owed fiduciary duties of care, loyalty and good faith to Plaintiffs.

115.   As the Managing Member of AGIC, AGMC owed Plaintiffs fiduciary duties of care, loyalty, good faith and not to take actions to benefit itself to the detriment of the Plaintiffs.

116.   As directors of AGIC, the Director Defendants owed Plaintiffs fiduciary duties of care, loyalty, good faith and not to take actions to benefit themselves to the detriment of the Plaintiffs.

117.   The Majority Members, AGMC, the Founding Members and the Director Defendants breached their fiduciary duties by participating in, causing, permitting, enabling, acquiescing and aiding and abetting the fraudulent scheme detailed herein, which includes but is not limited to misappropriating Plaintiffs' funds.

118.   The Majority Members, AGMC, the Founding Members and the Director Defendants breached their duties of care, loyalty and good faith to Plaintiffs by orchestrating, encouraging and/or utilizing various accounting schemes which they utilized to materially misstate the facts and circumstances of AGIC's financial condition and failing to properly maintain Plaintiffs' funds and disclose material information to Plaintiffs.

D703350v2

119.  The Majority Members, AGMC, the Founding Members and the Director Defendants breached their duties of care, loyalty and good faith to Plaintiffs by using Plaintiffs' investment to acquire their own interest in AGIC and/or AGMC.

120.  The Majority Members, AGMC, the Founding Members and the Director Defendants breached their duties of care, loyalty and good faith to Plaintiffs by offering to third-party investors more equity in AGIC than was available.

121.  Weinberg breached his fiduciary duty when he usurped Plaintiffs' investments to advance his own self-interest in unrelated transactions to AGIC without offering the opportunities to Plaintiffs.

122.  Plaintiffs suffered substantial damages as a result of these schemes, including but not limited to incurring additional and unnecessary debt and costs and the concealment of the condition of AGIC.  Such misconduct constitutes a breach of the duties of care, loyalty and good faith as well as corporate waste and mismanagement and dissipation of corporate assets.

123.  The Majority Members, AGMC, the Founding Members and the Director Defendants advanced their own pecuniary interests ahead of Plaintiffs in violation of their fiduciary duties when permitting and/or participating in the misappropriation of Plaintiffs' funds and failing to take the appropriate safeguards to protect Plaintiffs' funds before and following Plaintiffs' investments.

124.  The Majority Members, AGMC and the Director Defendants' actions were not the product of a valid business judgment but rather the product of gross negligence, mismanagement and corporate waste resulting in substantial harm to Plaintiffs.

D703350v2

125.   By reason of the foregoing, Plaintiffs have suffered substantial damages in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
(Aiding and Abetting a Breach of Fiduciary Duty – As Against Defendants)

126.   Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

127.   By reason of the actions described herein, the Majority Members, AGMC and the Director Defendants breached their fiduciary duties owed to Plaintiffs.

128.   Upon information and belief, the remaining Defendants knowingly participated and/or aided and abetted the Majority Members, AGMC and the Director Defendants in their breach of fiduciary duties.

129.   As a result of the foregoing, Plaintiffs' investments in AGIC have been misappropriated.

130.   By reason of the foregoing, Plaintiffs have suffered substantial damages in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION
(Malpractice- As Against Fensterman & the Abrams Firm)

131.   Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

132.   At all relevant times, defendant Fensterman was licensed to practice law in the State of New York.

133.   At all relevant times, defendant Fensterman was a partner of the Abrams Firm.

D703350v2

- 24 -

134.    Defendants Fensterman and the Abrams Firm provided legal services to Plaintiffs in connection with their investment in AGIC.

135.    Defendants Fensterman and the Abrams Firm had a legal and contractual obligation, as Plaintiffs' attorneys, to faithfully perform professional and legal duties on behalf of Plaintiffs with the requisite skill and standard of care in the profession.

136.    Plaintiffs fully and faithfully performed their contractual obligations to Fensterman and the Abrams Firm arising out of their attorney-client relationship.

137.    As set forth herein, defendants Fensterman and the Abrams Firm materially breached their legal and contractual obligations owed to Plaintiffs in failing to conduct requisite due diligence prior to and following Plaintiffs' investments in AGIC.

138.    Defendants Fensterman and the Abrams Firm materially breached their legal and contractual obligations owed to Plaintiffs in failing to review and investigate the documents issued in connection with the AGIC investment and to ensure that they comported with local, state, federal, and international rules and regulations.

139.    The documents governing the AGIC offering were replete with misstatements and inaccuracies which, if investigated, would have revealed that investing monies pursuant to the Private Offering Memorandum, the Business Plan and the Operating Agreement were not in Plaintiffs' best interests.

140.    Defendants Fensterman and the Abrams Firm breached their duty of loyalty to Plaintiffs by failing to adequately disclose their interest in AGIC.

141.    Defendants Fensterman and the Abrams Firm breached their duty to Plaintiffs by failing to obtain a waiver of conflict of interest from Plaintiffs relating to their interest as well as the interest of other partners of the Abrams Firm in AGIC.

142.    Defendants Fensterman and the Abrams Firm breached their fiduciary duty to Plaintiffs by transferring Plaintiffs' investments from the Abrams Firm's IOLA into accounts in which they admit were purportedly compromised.

143.    Defendants Fensterman and the Abrams Firm breached their fiduciary duty to Plaintiffs in failing to protect Plaintiffs' investment and then concealing and failing to timely disclose the loss of Plaintiffs' investments.

144.    Defendants Fensterman and the Abrams Firm's conduct were wanton, reckless, careless, and in violation of the New York State code of professional responsibility and the Rules of the American Bar Association.

145.    Plaintiffs would not have invested in AGIC had Plaintiffs' known about defendants' Fensterman and the Abrams Firm's failure to perform their professional duties as their attorney and to ensure the accuracy of the documents governing the investments.

146.    Defendants Fensterman and the Abrams Firm advanced their own pecuniary interests ahead of Plaintiffs in violation of their fiduciary duties owed to Plaintiffs when permitting the misappropriation of Plaintiffs' funds and failing to take the appropriate safeguards to protect Plaintiffs' funds.

147.    The conduct of defendants Fensterman and the Abrams Firm constitute legal malpractice which has caused and continues to cause substantial damage to Plaintiffs.

148.    By reason of the foregoing, Plaintiffs have suffered substantial damages in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
(Breach of Contract-As Against Fensterman & the Abrams Firm)

149.    Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

150.    Plaintiffs retained either expressly or implicitly, defendants Fensterman and the Abrams Firm to provide legal advice, consultation and representation in connection with Plaintiffs' investments.

151.    Plaintiffs' invested monies in AGIC in reliance upon the consultation and advice provided by defendants Fensterman and the Abrams Firm.

152.    Defendants Fensterman and the Abrams Firm materially breached their express and/or implied promise to provide legal services in furtherance of Plaintiffs' best interests with the requisite skill and care required in the profession.

153.    By reason of the foregoing, Plaintiffs have suffered substantial damages in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Breach of Contract – As Against the Majority Members,
the Founding Members, AGMC, AGIC & the Director Defendants)

154.    Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

155.    The Private Offering Memorandum, the Business Plan and the Operating Agreement are valid contracts binding upon Plaintiffs, the Majority Members, the Founding Members, AGMC, AGIC and the Director Defendants.

156.    Under the Operating Agreement, the Majority Members, the Founding Members, AGMC and the Director Defendants were required to invest Plaintiffs' funds in AGIC.

D703350v2

- 27 -

157.   Pursuant to the Operating Agreement, the Majority Members, the Founding Members, AGMC, AGIC and the Director Defendants were required to (i) manage AGIC's operating income; (ii) manage Plaintiffs' investments; (iii) not to commingle Plaintiffs' funds with any other entity or person; (iv) appropriately transfer Plaintiffs' investments; (v) deposit Plaintiffs' investments into AGIC's bank account; and (vi) ensure that Plaintiffs' funds were withdrawn only for a bona fide legitimate business purpose.

158.   The Majority Members, the Founding Members, AGMC, AGIC and the Director Defendants have materially breached their obligations under the Operating Agreement.

159.   Plaintiffs invested in AGIC in reliance on the Majority Members', the Founding Members', AGMC's and the Director Defendants' representations that they would perform their obligations under the Private Offering Memorandum, the Business Plan and the Operating Agreement.

160.   Plaintiffs have made repeated requests for the return of their funds.

161.   The Majority Members, the Founding Members, AGMC, AGIC and the Director Defendants have refused to return Plaintiffs' funds.

162.   The Majority Members, the Founding Members, AGMC, AGIC and the Director Defendants failed to arrange for the appropriate banking safeguards while maintaining Plaintiffs' funds.

163.   The Majority Members, the Founding Members, AGMC, AGIC and the Director Defendants have refused and continue to refuse to honor their obligations under the Operating Agreement.

164.    By reason of the foregoing, Plaintiffs have suffered substantial damages in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Unjust Enrichment- As Against Defendants)

165.    Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

166.    Upon information and belief, the Defendants personally benefited by engaging and participating in the conduct described above, including but not limited to causing Plaintiffs to invest under false and misleading representations and then misappropriating Plaintiffs' funds.

167.    Upon information and belief, the Defendants acted in concert and with the intent of concealing the true purpose and financial condition of AGIC to induce further contributions by Plaintiffs to personally profit at Plaintiffs' expense.

168.    It is inequitable and unjust for Defendants to have received and retain such benefits.

169.    The Defendants are obligated to disgorge Plaintiffs' funds which were unlawfully obtained.

170.    Upon information and belief, with the knowledge and consent of the Defendants, Plaintiffs transferred their funds based on the Majority Members' and AGMC's false and misleading promises to Plaintiffs that their investment would be held in escrow and only used for its intended purpose, which it was not.

171.    As a result of the fraudulent, deceitful, unfair, and unconscionable conduct of Defendants, each has been unjustly enriched at the expense of Plaintiffs.

D703350v2

172.   By reason of the foregoing, Plaintiffs have suffered substantial damages in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION
(Fraud in the Factum – As against the Majority Members, the Founding Members & AGMC)

173.   Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

174.   The Majority Members, the Founding Members and AGMC falsified corporate records and AGIC's financial condition to conceal their improper use of Plaintiffs' funds for their own benefit.

175.   Upon information and belief, the Majority Members, the Founding Members and AGMC falsified the Private Offering Memorandum and the Business Plan and projected false earnings to conceal the fraud, mismanagement and corporate waste of Plaintiffs' funds all to Plaintiffs' detriment and to the benefit of the Majority Members and AGMC.

176.   Such active concealment of relevant facts and information has prevented Plaintiffs from gaining full knowledge of the financial condition of AGIC and has allowed the Majority Members, the Founding Members and AGMC to perpetuate their fraud.

177.   The Majority Members, the Founding Members and AGMC, upon information and belief, with the knowledge and consent of the remaining Defendants, falsely represented to Plaintiffs that they would invest Plaintiffs' funds as promised.

178.   The Majority Members, the Founding Members and AGMC did not invest Plaintiffs' funds as promised.

179.   The Majority Members, the Founding Members and AGMC have engaged in fraud through overt misrepresentations of material facts, silence in the face of a duty to speak,

D703350v2

- 30 -

and active concealment of material facts. Here, the Majority Members, the Founding Members and AGMC overtly misrepresented that AGIC was in the process of obtaining its license and misrepresented that AGIC did obtain its license. The Majority Members, the Founding Members and AGMC failed to disclose material information relating to AGIC's ability to obtain its license and the security of Plaintiffs' investments. The Majority Members', the Founding Members' and AGMC's silence of their affirmative duty of disclosure was fraud upon Plaintiffs.

180.   The Majority Members, the Founding Members and AGMC engaged in fraud when they used superior information and knowledge to mislead Plaintiffs.

181.   Plaintiffs would not have transferred their funds had Plaintiffs known of the Majority Members', the Founding Members' and AGMC's intent to defraud Plaintiffs.

182.   By reason of the foregoing, Plaintiffs have suffered substantial damages in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

## AS AND FOR A EIGHTH CAUSE OF ACTION
(Fraud in the Inducement – As Against the Majority Members,
the Founding Members & AGMC)

183.   Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

184.   Plaintiffs reasonably relied upon the truth of the representations and material statements made by the Majority Members, the Founding Members, and AGMC, upon information and belief, with the knowledge and consent of the remaining Defendants, concerning the basis for investing in AGIC.

185.   The Majority Members, the Founding Members, and AGMC, upon information and belief, with the knowledge and consent of the remaining Defendants, had no intent to

perform their obligations under the Private Offering Memorandum, the Business Plan or Operating Agreement or to otherwise invest Plaintiffs' funds as promised.

186.   Upon information and belief, the Majority Members, the Founding Members, and AGMC, with the knowledge and consent of the remaining Defendants, had a premeditated and undisclosed intention not to honor their obligations to Plaintiffs, but rather to acquire Plaintiffs' funds for their own benefit.

187.   Upon information and belief, prior to the formation of AGIC, the Majority Members, the Founding Members, and AGMC, with the knowledge and consent of the remaining Defendants, intended to usurp Plaintiffs' funds for their own benefit by intentionally and fraudulently misrepresenting to Plaintiffs they would honor their obligations under the Private Offering Memorandum, the Business Plan and Operating Agreement and invest Plaintiffs' funds as promised.

188.   The Majority Members, the Founding Members, and AGMC, upon information and belief, with the knowledge and consent of the remaining Defendants, represented to Plaintiffs that, as consideration for their investments, the funds would be held in the Abrams Firm's IOLA only as security for insurance claims.

189.   The above statements and representations were made intentionally and materially false and misleading.

190.   As a result of the Majority Members', the Founding Members' and AGMC's material misstatements and omissions of material facts, Plaintiffs were induced into transferring funds to the Abrams Firm's IOLA.

191.    Plaintiffs would not have transferred their funds to the Abrams Firm's IOLA had they known of the Majority Members', the Founding Members' and AGMC's undisclosed intent to defraud Plaintiffs through material misstatements and omissions of material facts.

192.    By reason of the foregoing, Plaintiffs have suffered substantial damages in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

## AS AND FOR A NINTH CAUSE OF ACTION
(Negligent Misrepresentation - As Against Defendants)

193.    Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

194.    The Majority Members, upon information and belief, with the knowledge and consent of the remaining Defendants, represented to Plaintiffs that, as consideration for their investments, Plaintiffs' funds would be held in the Abrams Firm's IOLA.

195.    Those representations, at the very least, were made negligently, carelessly, and/or recklessly, and were false and misleading.

196.    Defendants knew or should have known that Plaintiffs would rely upon the negligent misrepresentations made to them.

197.    As a direct and proximate result of reliance on the misrepresentations of the Majority Members and AGMC, with the consent and knowledge of the remaining Defendants, Plaintiffs' investments were misappropriated.

198.    Plaintiffs relied upon Defendants' negligent misrepresentations to their detriment.

199.    By reason of the foregoing, Plaintiffs have suffered substantial damages in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

D703350v2

## AS AND FOR A TENTH CAUSE OF ACTION
(Conversion – As Against the Majority Members,
the Directors Defendants, the Founding Members & AGMC)

200.    Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

201.    In or about July 2007, the Majority Members, the Directors Defendants, the Founding Members and AGMC, upon information and belief, with the remaining Defendants knowledge and consent, unlawfully and without Plaintiffs' consent, converted and/or misappropriated Plaintiffs' investments for their own benefit, without the intent to utilize Plaintiffs' investments as promised.

202.    At the time of the conversion and/or misappropriation, Plaintiffs were the legal owners of said investments.

203.    The Majority Members, the Directors Defendants, the Founding Members and AGMC converted and/or misappropriated Plaintiffs' investments for their own benefit.

204.    Upon information and belief, the Majority Members, the Directors Defendants, the Founding Members and AGMC are in possession and have wrongfully exercised control over and interfered with Plaintiffs' right of possession to their investments, to the detriment of Plaintiffs.

205.    Plaintiffs are entitled to the return of the value of their investments at the time of its conversion.

206.    The Majority Members, the Directors Defendants, the Founding Members and AGMC have failed and refused to restore the value of Plaintiffs' investments at the time of its conversion.

207.    The sum of $1,600,000.00 represents the value of Plaintiffs' investments.

D703350v2

- 34 -

208.    The acts of the Majority Members, the Directors Defendants, the Founding Members and AGMC were wilful, wanton, malicious and oppressive.

209.    By reason of the foregoing, Plaintiffs have suffered substantial damages in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
(Aiding and Abetting Conversion- As Against Defendants)

210.    Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

211.    In or about August 2007, the Majority Members, the Founding Members and AGMC, with the consent and knowledge of Defendants, unlawfully and without Plaintiffs' consent, converted and misappropriated Plaintiffs' investments in AGIC.

212.    Upon information and belief, each of the individual Defendants had actual knowledge of the wrongful conversion of Plaintiffs' investments in AGIC.

213.    Upon information and belief, each of the individual Defendants knowingly and actively participated in the wrongful conversion of Plaintiffs' investments in AGIC.

214.    Upon information and belief, each of the individual Defendants substantially assisted in unlawfully and wrongfully converting Plaintiffs' investments in AGIC for their own benefit, to the detriment of Plaintiffs.

215.    By reason of the foregoing, Plaintiffs have suffered substantial damages in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

## AS AND FOR A TWELFTH CAUSE OF ACTION
(Constructive Trust - As Against Defendants)

216.   Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

217.   Defendants were under a heightened duty when negotiating and acquiring Plaintiffs' investments in AGIC.

218.   Defendants made express and/or implied promises to perform all of their obligations under the Private Offering Memorandum, the Business Plan and Operating Agreement.

219.   As a result of Defendants' misrepresentations and omissions of material facts to Plaintiffs', Plaintiffs were fraudulently induced to invest in AGIC.

220.   It would be unjust to allow Defendants to realize the value of Plaintiffs' investments in AGIC at the time they were transferred.

221.   By reason of the forgoing, Plaintiffs are entitled to a constructive trust in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest and punitive damages.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
(Racketeer Influenced and Corrupt Organizations Act
Violations of 18 U.S.C. § 1961 et seq. - As Against Defendants)

222.   Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

223.   Upon information and belief, Defendants acting jointly, severally and in concert together, have engaged in unlawful acts, practices and courses of conduct that constitute violations of 18 U.S.C. §§ 1341, 1343, 2314.

224.   Upon information and belief, Defendants have engaged in "racketeering" activity as defined in the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 ("RICO").

225.   Plaintiffs are each a person as defined in 18 U.S.C. § 1961.

226.   Upon information and belief, Defendants are each a person as defined in 18 U.S.C. § 1961.

227.   Upon information and belief, at all relevant times, Defendants, have been associated with and/or employed by an "Enterprise," as the term is defined in 18 U.S.C § 1961, which was engaged in, or which the activities of which, affect interstate commerce.

228.   Upon information and belief, the aforesaid Enterprise consisted of Defendants each acting in association with one another as defined in 18 U.S.C. § 1962.

229.   Upon information and belief, at all relevant times, the Enterprise was engaged in interstate commerce, as its activities affected interstate commerce, and the Enterprise engaged in interstate mail and wire transactions in furtherance of its acts.

230.   Upon information and belief, at all relevant times, the Enterprise was separate from the pattern of racketeering activity, and distinct from the persons conducting the affairs of the Enterprise.

231.   Upon information and belief, while committing and engaging in unlawful acts and practices described herein, Defendants jointly and severally acted in violation of 18 U.S.C. §§ 1341, 1343, 2314, by causing to be mailed through the United States Postal Service and transferred through the United States banking system, unlawful conduct that affected interstate commerce.

232.  Upon information and belief, Defendants conspired to and did in fact perpetrate fraud through the commission of wire fraud and mail fraud. Defendants executed their scheme to defraud Plaintiffs, and in doing so, caused certain mail to be delivered through the United States Postal Service and caused certain payments to be wire transferred through the United States banking system, both in violation of 18 U.S.C. § 1341. Such acts of a pattern of racketeering through wire and mail fraud include, but are not limited to, Defendants (i) carrying out a scheme that resulted in a series fraudulent statements and omissions inducing Plaintiffs to infuse monies into AGIC; (ii) continuing to refuse to invest Plaintiffs' funds as promised; (iii) drawing on Plaintiffs' funds in AGIC's bank account without authorization to the detriment of Plaintiffs; and (iv) related documents to perpetrate such acts.

233.  Upon information and belief, Defendants conspired to, and did in fact, intentionally misrepresent and omit material facts from Plaintiffs and omitted to disclose material facts to the detriment of Plaintiffs.

234.  Plaintiffs' investments in AGIC were based upon those material misrepresentations and omissions that affect Plaintiffs' business and livelihood, which extends beyond Delaware.

235.  Upon information and belief, at all relevant times, Defendants did conduct and participate, both directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962.

236.  Through their violations of 18 U.S.C. § 1962, and as a consequence of the aforesaid predicate acts, Defendants caused injury to Plaintiffs in their business and property.

237.  Defendants' actions of carrying out a scheme that resulted in a series of fraudulent statements and omissions inducing Plaintiffs to invest in AGIC has proximately caused

Plaintiffs' injury in that it was a substantial factor in the sequence of responsible causation, including but not limited to, the loss suffered as a result of the fraud and material misstatements and omissions, namely an amount equal to the value of the investments, the lost profits and income that would have been generated but for Defendants' scheme to defraud Plaintiffs and Plaintiffs' costs and attorneys' fees associated with the investigation necessary to uncover Defendants' scheme and the resulting prosecution of this matter.

238.  Defendants' actions of carrying out a scheme that resulted in a series fraudulent statements and omissions inducing Plaintiffs to invest into AGIC is a direct result of Plaintiffs' injury to their business and property, including but not limited to, the loss suffered as a result of the fraud and material misstatements and omissions, namely an amount equal to the value of the investments, the lost profits and income that would have been generated but for Defendants' scheme to defraud Plaintiffs, and Plaintiffs' costs and attorneys' fees associated with the investigation necessary to uncover Defendants' scheme and the resulting prosecution of this matter.

239.  The aforementioned injury was reasonably foreseeable or anticipated as a natural consequence as a result of Defendants' fraudulent conduct.

240.  As a direct and proximate result of the foregoing violations, Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with treble damages and interest, plus the costs and expenses of this action, including attorneys' fees and disbursements, pursuant to 18 U.S.C. § 1964.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
(Racketeer Influenced and Corrupt Organizations
Act Violations of 18 U.S.C. § 1962(d) Conspiracy - As Against Defendants)

241. Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

242. Upon information and belief, Defendants knowingly and willfully conspired to violate 18 U.S.C. § 1962 by agreeing, expressly or impliedly, that Defendants would conduct the affairs of their Enterprise through a pattern of racketeering activity through wire and mail fraud which include, but are not limited to, Defendants (i) carrying out a scheme that resulted in a series fraudulent statements inducing Plaintiffs to invest in AGIC; (ii) continuing to refuse to invest in Plaintiffs' funds as promised; (iii) drawing on Plaintiffs' funds in AGIC's bank account without authorization to the detriment of Plaintiffs; and (iv) related documents to perpetrate such acts.

243. Upon information and belief, in furtherance of Defendants' racketeering conspiracy, each of the Defendants agreed, expressly or impliedly, that the racketeering acts alleged herein would be committed in the conduct of the affairs of the Enterprise.

244. Upon information and belief, at all relevant times, the Enterprise was separate from the pattern of racketeering activity, and distinct from the persons conducting the affairs of the Enterprise.

245. Upon information and belief, the aforesaid conduct constitutes a violation of 18 U.S.C. § 1962.

246. Defendants' actions of carrying out a scheme that resulted in a series of fraudulent statements and omissions inducing Plaintiffs to invest in AGIC has proximately caused Plaintiffs' injury in that it was a substantial factor in the sequence of responsible causation,

D703350v2

including but not limited to, the loss suffered as a result of the fraud and material misstatements and omissions, namely an amount equal to the value of Plaintiffs' investments in AGIC, the lost profits and income that would have been generated but for Defendants' scheme to defraud Plaintiffs and Plaintiffs' costs and attorneys' fees associated with the investigation necessary to uncover Defendants' scheme and the resulting prosecution of this matter.

247.   Plaintiffs' damages include, but are not limited to, an amount equal to the value of Plaintiffs' investments in AGIC, the lost profits and income that would have been generated but for Defendants' scheme to defraud Plaintiffs, and Plaintiffs' costs and attorneys' fees associated with the investigation necessary to uncover Defendants' scheme and the resulting prosecution of this matter.  Plaintiffs are further entitled to treble damages pursuant to 18 U.S.C. § 1964.

248.   Defendants' actions of carrying out a scheme that resulted in a series of fraudulent statements and omissions inducing Plaintiffs to invest in AGIC is a direct result of Plaintiffs' injury to their business and property, including but not limited to, the loss suffered as a result of the fraud and material misstatements and omissions, namely an amount equal to the value of Plaintiffs' investments, the lost profits and income that would have been generated but for Defendants' scheme to defraud Plaintiffs and Plaintiffs' costs and attorneys' fees associated with the investigation necessary to uncover Defendants' scheme and the resulting prosecution of this matter.

249.   The aforementioned injury is reasonably foreseeable or anticipated as a natural consequence as a result of Defendants' fraudulent conduct.

250.   By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with treble

damages and interest, plus the costs and expenses of this action, including attorneys' fees and disbursements, pursuant to 18 U.S.C. § 1964.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
### (Accounting- As Against Defendants)

251.   Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

252.   By reason of the foregoing, Plaintiffs are entitled to a full accounting of Defendants' income, dividends, bonuses, expenses, benefits and other profits and monies Defendants took for their own benefit, to the detriment of Plaintiffs, including but not limited to an accounting of all disbursements made from the Abrams Firm's IOLA of Plaintiffs' investments.

253.   By reason of the foregoing, Plaintiffs have suffered substantial damages in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that judgment be entered against the Defendants, as follows:

A.   On the First Cause of Action, awarding Plaintiffs compensatory damages against the Majority Members, the Founding Members, the Director Defendants and AGMC in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

B.   On the Second Cause of Action, awarding Plaintiffs compensatory damages against Defendants in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

D703350v2

- 42 -

C.     On the Third Cause of Action, awarding Plaintiffs compensatory damages against defendants Howard Fensterman and the Abrams Firm in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

D.     On the Fourth Cause of Action, awarding Plaintiffs compensatory damages against defendants Howard Fensterman and the Abrams Firm in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon.

E.     On the Fifth Cause of Action, awarding Plaintiffs compensatory damages against the Majority Members, the Founding Members, AGMC, AGIC and the Director Defendants in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon.

F.     On the Sixth Cause of Action, awarding Plaintiffs compensatory damages against Defendants in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

G.     On the Seventh Cause of Action, awarding Plaintiffs compensatory damages against the Majority Members, the Founding Member and AGMC in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

H.     On the Eighth Cause of Action, granting Plaintiffs compensatory damages against the Majority Members, the Founding Members and AGMC in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

D703350v2

I.    On the Ninth Cause of Action, granting Plaintiffs compensatory damages against the Defendants in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

J.    On the Tenth Cause of Action, granting Plaintiffs compensatory damages against the Majority Members, the Founding Members, the Director Defendants and AGMC in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

K.    On the Eleventh Cause of Action, granting Plaintiffs compensatory damages against Defendants in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

L.    On the Twelfth Cause of Action, granting Plaintiffs a constructive trust against Defendants in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

M.    On the Thirteenth Cause of Action, awarding Plaintiffs compensatory damages against Defendants in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with treble damages and interest, plus the costs and expenses of this action, including attorneys' fees and disbursements, pursuant to 18 U.S.C. § 1964.

N.    On the Fourteenth Cause of Action, awarding Plaintiffs compensatory damages against Defendants in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with treble damages and interest, plus the costs and expenses of this action, including attorneys' fees and disbursements, pursuant to 18 U.S.C. § 1964.

O.    On the Fifteenth Cause of Action, an accounting by Plaintiffs of Defendants' income, dividends, bonuses, expenses, benefits and other profits and monies Defendants took for

their own benefit, and judgment for Plaintiffs awarding compensatory damages against Defendants in an amount to be determined at trial, but in no event less than the sum of $1,600,000.00, together with interest thereon and punitive damages.

       P.     Awarding Plaintiffs their costs, disbursements, and their attorneys' fees in this action.

Dated: June 7, 2010

                          JASPAN SCHLESINGER LLP

                          /s/ Michael A. Leon

                          Michael A. Leon (#4731)
                          *Attorneys for Plaintiffs*
                          913 North Market Street
                          Wilmington, Delaware 19801
                          (302) 351-8000

D703350v2

EXHIBIT "B"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
------------------------------------------------------------X
SCOTT MORRELL and ROSELEE MORRELL,

                          Plaintiffs,

          -against-

THE GOLDEN GOSLINGS, INC. d/b/a
MYZIVA, MZ CONSULTING COMPANY, LLC,
MZ NATIONAL, LLC, ROBERT ABRAMS,
HOWARD FENSTERMAN, ABRAMS,
FENSTERMAN, FENSTERMAN, EISMAN,
GREENBERG, FORMATO & EINIGER, LLP,

                          Defendants.
------------------------------------------------------------X

**SUMMONS**

Index No.: 10-- 016231
Purchased: 8/27/2010

Plaintiffs designate Nassau
County as the place of trial. The
basis of venue is the principal
place of business for Defendants.

Defendants' principal place of
business is 1111 Marcus Avenue,
Suite 107, Lake Success, New
York 11042.

**TO THE ABOVE-NAMED DEFENDANTS:**

YOU ARE HEREBY SUMMONED AND REQUIRED TO SERVE upon the
undersigned, Jaspan Schlesinger LLP, 300 Garden City Plaza, Garden City, New York 11530, as
attorneys for Plaintiffs, Scott Morrell and RoseLee Morrell, a Verified Answer to the annexed
Verified Complaint, which is herewith served upon you, within twenty (20) days after service
hereof, exclusive of the day of service or within thirty (30) days after the service is complete, if
service is made by any method other than personal delivery to you within the State of New York.

In case of your failure to answer the Verified Complaint, judgment will be taken against
you by default for the relief demanded therein.

Dated:   Garden City, New York
        August 4, 2010

                                        JASPAN SCHLESINGER LLP
                                        Attorneys for Plaintiffs

                                        Steven R. Schlesinger
                                        Michael A. Leon
                                        Jared A. Kasschau
                                        300 Garden City Plaza
                                        Garden City, New York 11530
                                        516-746-8000

To:    The Golden Goslings, Inc. d/b/a MYZIVA
       1111 Marcus Avenue, Suite 107
       Lake Success, New York 11042

       MZ Consulting Company, LLC
       1111 Marcus Avenue, Suite 107
       Lake Success, New York 11042

       MZ National, LLC
       1111 Marcus Avenue, Suite 107
       Lake Success, New York 11042

       Robert Abrams, Esq.
       Abrams, Fensterman, Fensterman, Eisman,
       Greenberg, Formato & Einiger, LLP
       1111 Marcus Avenue, Suite 107
       Lake Success, New York 11042

       Howard Fensterman, Esq.
       Abrams, Fensterman, Fensterman, Eisman,
       Greenberg, Formato & Einiger, LLP
       1111 Marcus Avenue, Suite 107
       Lake Success, New York 11042
       (516) 328-2300

       Abrams, Fensterman, Fensterman, Eisman,
       Greenberg, Formato & Einiger, LLP
       1111 Marcus Avenue, Suite 107
       Lake Success, New York 11042
       (516) 328-2300

2

D717728

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
------------------------------------------------------------X
SCOTT MORRELL and ROSELEE MORRELL,

                Plaintiffs,                         Index No.: 10--016231

        -against-

THE GOLDEN GOSLINGS, INC. d/b/a               **VERIFIED COMPLAINT**
MYZIVA, MZ CONSULTING COMPANY, LLC,
MZ NATIONAL, LLC, ROBERT ABRAMS,
HOWARD FENSTERMAN, ABRAMS,
FENSTERMAN, FENSTERMAN, EISMAN,
GREENBERG, FORMATO & EINIGER, LLP,

                Defendants.
------------------------------------------------------------X

      Plaintiffs, Scott Morrell and RoseLee Morrell, by and through their attorneys, Jaspan

Schlesinger LLP, as and for their Verified Complaint against defendants, allege as follows:

## NATURE OF ACTION

    1.     This action arises from defendants' Robert Abrams, Howard Fensterman and the

firm of Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP legal

malpractice, fraud and breach of contract in connection with a loan made by plaintiff Scott

Morrell in the principal amount of $400,000.00 and plaintiffs' capital contributions in the

amount of $200,000.00 to defendants The Golden Goslings, Inc. d/b/a MYZIVA, MZ Consulting

Company, LLC, and MZ National, LLC.

    2.     Mr. Morrell was induced to issue a loan for $400,000.00 by his attorneys, at the

time, who knew that defendants had no intent to satisfy the loan.  Mr. Morrell's attorneys

advised him to issue the loan based upon material misrepresentations and omissions of facts.

3.     It is believed that defendants' Robert Abrams, Howard Fensterman and Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP misappropriated the funds from the loan for their own benefit to the detriment of Mr. Morrell.

4.     Plaintiffs were also induced to issue capital contributions in the amount of $200,000.00, by their attorneys at the time, who subsequently advised them in breach of their fiduciary duties, to relinquish their interests without any consideration.

5.     Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than the sum of $600,000.00, together with interest thereon and punitive damages.

## PARTIES

6.     At all relevant times, plaintiff Scott Morrell ("Mr. Morrell") is a natural person residing in the County of Nassau, State of New York.

7.     At all relevant times, plaintiff RoseLee Morrell ("Ms. Morrell") is a natural person residing in the County of Nassau, State of New York.

8.     Mr. Morrell and Ms. Morrell are collectively referred to as "Plaintiffs".

9.     Upon information and belief and at all relevant times, defendant Golden Goslings, Inc., d/b/a MYZIVA ("Golden Goslings"), is a New York corporation with an address located at 1111 Marcus Avenue, Suite 107, Lake Success, New York 11042.

10.    Upon information and belief and at all relevant times, defendant MZ Consulting Company, LLC ("MZ Consulting"), is a New York limited liability company with an address located at 1111 Marcus Avenue, Suite 107, Lake Success, New York 11042.

11.    Upon information and belief and at all relevant times, defendant MZ National, LLC ("MZ National", together with Golden Goslings and MZ Consulting are collectively

D714046v3

2

referred to as "MYZIVA"), is a New York limited liability company with an address located at 1111 Marcus Avenue, Suite 107, Lake Success, New York 11042.

12.    Upon information and belief and at all relevant times, defendant Robert Abrams ("Abrams"), is the President of MYZIVA and an attorney duly licensed to practice law before the courts of the State of New York.

13.    Abrams is Of Counsel to the law firm of defendant Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP.

14.    Upon information and belief and at all relevant times, defendant Howard Fensterman ("Fensterman"), is an attorney duly licensed to practice law before the courts of the State of New York.

15.    Fensterman is a partner of the law firm of defendant Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP.

16.    Upon information and belief and at all relevant times, defendant Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP (the "Firm"), is a New York limited liability partnership that provides legal services with offices located at 1111 Marcus Avenue, Suite 107, Lake Success, New York 11042.

17.    MYZIVA, Abrams, Fensterman and the Firm are collectively referred to as "Defendants".

## FACTS COMMON TO ALL CAUSES OF ACTION

18.    In or around 2002, defendants Abrams and Fensterman solicited Plaintiffs to purchase an interest in MYZIVA.

19.    MYZIVA offered internet-based products and information relating to the nursing home industry to both caregivers and consumers.

20.     In or around September 2002, upon the advice of Abram, Fensterman and the Firm, Mr. Morrell agreed to loan $400,000.00 to MYZIVA which was required to be satisfied in full by September 30, 2007, plus interest.

21.     Mr. Morrell was also to receive a 5% interest in MYZIVA.

22.     At all relevant times, Abrams, Fensterman and the Firm were Mr. Morrell's legal counsel in connection with the loan.

23.     In or around September 30, 2002, upon the advice of Abrams, Fensterman and the Firm, Mr. Morrell entered into the Stock and Membership Interest Purchase Agreement (the "Purchase Agreement") with MYZIVA.

24.     The Purchase Agreement memorialized the loan and Mr. Morrell's 5% interest in the MYZIVA companies, as follows:

> 2.     **Purchase Price**.     The aggregate purchase price for the Shares, the MZ National interest and the MZ Consulting interest shall be One Hundred Thousand Dollars ($100,000) (the "Purchase Price"), which amount has been paid prior to the date hereof and the receipt of which is hereby acknowledged by the Sellers.
>
> 3.     **Advance Amount**.     In addition to the Purchase Price and as further consideration for the rights and interests purchased by the Purchaser in § 1, above, the Purchaser hereby agrees to advance the Sellers Four Hundred Thousand Dollars ($400,000) (the "Advance Amount"). The Purchaser and the Sellers hereby acknowledge and agree that (i) One Hundred Thousand Dollars ($100,000.00) of the Advance Amount has been paid to the Purchaser prior to the date hereof, the receipt of which is hereby acknowledged by the Sellers; and (ii) the balance of the Advance Amount shall be paid simultaneously with the execution hereof by wire transfer of immediately available funds, by check or in such other manner as the parties may agree. Interest shall accrue on the Advance amount at a rate per annum equal to eight percent (8%), which interest shall not be compounded on any periodic basis but will be calculated on a simple basis. The advance amount together with any pro rata portion of the interest, shall be repaid by Sellers and to the Purchaser in the following manner:
>
> ...

A copy of the Purchase Agreement is annexed hereto as Exhibit "A".

25.     The Purchase Agreement further provides that:

>       (c)      In the event that the Advance Amount, plus the accrued and unpaid interest thereon is not fully repaid by Sellers in accordance with subparagraphs (a) and (b) above on or before the fifth (5th) anniversary of the date hereof (the "Final Payment Date"), the Sellers hall repay the entire remaining balance of the Advance Amount, including all accrued and unpaid interest thereon, on the Final Payment Date.

See Exhibit "A".

26.     In or around September 2002, upon the advice and counsel of Abrams, Fensterman and the Firm, Plaintiffs each invested $100,000.00 in exchange for an interest in MYZIVA.

27.     Abrams, Fensterman and the Firm facilitated Plaintiffs' investments in MYZIVA.

28.     Mr. Morrell repeatedly contacted Fensterman about the status of his loan and investment with MYZIVA.

29.     Fensterman repeatedly represented that the loan would be repaid in full by the September 30, 2007 deadline.

30.     Those representations were knowingly made false.

31.     MYZIVA failed to repay any portion of the loan.

32.     Mr. Morrell is currently owed the balance of the $400,000.00 loan plus interest, which was due on September 30, 2007.

33.     It is believed that the representations made by Abrams, Fensterman and the Firm in connection with Mr. Morrell's loan and execution of the Purchase Agreement were false and made only to induce Mr. Morrell to issue the loan in furtherance of Abrams', Fensterman's and the Firm's effort to stave off significant personal financial loss.

5

D714046v3

34.    It is believed that Abrams, Fensterman and the Firm's duty of loyalty was to MYZIVA and not Plaintiffs as required.

35.    As a result, Abrams, Fensterman and the Firm induced Mr. Morrell to issue the loan.

36.    On December 31, 2007, defendants Fensterman and Abrams, on behalf of the Firm and MYZIVA, induced Mr. Morrell to execute a Share Abandonment Agreement (the "Share Abandonment Agreement").  A copy of the Share Abandonment Agreement is annexed hereto as Exhibit "B".

37.    The Share Abandonment Agreement extinguished and assigned all of Mr. Morrell's rights, title and interest in Golden Goslings back to Golden Goslings for the nominal sum of $10.00.

38.    Fensterman and Abrams represented to Mr. Morrell, as his attorneys, that in exchange for the Share Abandonment Agreement he would receive a ten percent (10%) of the profits of Golden Goslings.

39.    Mr. Morrell did not receive the ten percent (10%) profit interest as promised.

40.    Similarly, in or around December 2007, Ms. Morrell, upon the advice and counsel of Fensterman, Abrams and the Firm, induced Ms. Morrell to execute a share abandonment agreement which extinguished and assigned all of Ms. Morrell's rights, title and interest in Golden Goslings back to Golden Goslings for the nominal sum of $10.00.

41.    Ms. Morrell did not receive any consideration in exchange for executing the share abandonment agreement.

42.    It is believed that the representations made by Abrams, Fensterman and the Firm in connection with Plaintiffs' investments and execution of the share abandonment agreements

were false and made only to induce Plaintiffs to abandon their interest in Golden Goslings in furtherance of Abrams', Fensterman's and the Firm's effort to stave off significant personal financial loss.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract—As Against Defendants)

43.    Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

44.    The Purchase Agreement is a valid and binding agreement.

45.    Mr. Morrell loaned $400,000.00 pursuant to the terms of the Purchase Agreement.

46.    Mr. Morrell performed all of his obligations under the Purchase Agreement.

47.    Mr. Morrell relied upon the legal advice of defendants Abrams, Fensterman and the Firm in connection with the loan and the Purchase Agreement.

48.    Defendants breached the material terms of the Purchase Agreement in refusing to satisfy the principal balance due under the loan in the amount of $400,000.00, plus interest.

49.    By reason of the foregoing, Mr. Morrell has been damaged in an amount to be determined at trial, but in no event less than the sum of $400,000.00, together with interest thereon.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract—As Against Defendants)

50.    Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

51.    The share abandonment agreements are valid and binding agreements.

52.    Plaintiffs issued $200,000.000 pursuant to the terms of the share abandonment agreements.

53. Plaintiffs performed all of their obligations under the share abandonment agreements.

54. Plaintiffs relied upon the legal advice of defendants Abrams, Fensterman and the Firm in connection with the share abandonment agreements.

55. Defendants breached the material terms of the share abandonment agreements in failing to give Plaintiffs' the ten percent (10%) of the profits of Golden Goslings as promised.

56. By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than the sum of $200,000.00, together with interest thereon.

## AS AND FOR A THIRD CAUSE OF ACTION
(Breach of Fiduciary Duty—As Against Abrams, Fensterman and the Firm)

57. Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

58. Abrams owed Plaintiffs the fiduciary duties of care, loyalty and good faith.

59. Fensterman owed Plaintiffs the fiduciary duties of care, loyalty and good faith.

60. Abrams, Fensterman and the Firm breached their fiduciary duties by inducing Mr. Morrell to issue the loan based on material misrepresentations and omissions of material facts.

61. Abrams, Fensterman and the Firm breached their fiduciary duties owed to Plaintiffs when they induced Plaintiffs to relinquish their interest in MYZIVA for their own benefit to the detriment of Plaintiffs.

62. Abrams, Fensterman and the Firm breached their fiduciary duties by inducing Plaintiffs to execute the Share Abandonment Agreement based on material misrepresentations and omissions of material facts.

8

63.     Abrams, Fensterman and the Firm breached their fiduciary duties by inducing Plaintiffs to invest $200,000.00 into MYZIVA based on material misrepresentations and omissions of material facts.

64.     Abrams, Fensterman and the Firm breached their fiduciary duties by placing their own interests ahead of Plaintiffs.

65.     By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than the sum of $600,000.00, together with interest thereon and punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
(Malpractice—As Against Abrams, Fensterman and the Firm)

66.     Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

67.     At all relevant times, defendants Abrams and Fensterman were licensed to practice law in the State of New York.

68.     At all relevant times, defendants Abrams and Fensterman were employed by the Firm.

69.     At all relevant times, defendants Abrams, Fensterman and the Firm provided legal services to Plaintiffs in connection with their investments and Mr. Morrell's loan.

70.     Defendants Abrams, Fensterman and the Firm had a legal and contractual obligation, as Plaintiffs' attorneys, to faithfully perform professional and legal duties on behalf of Plaintiffs with the requisite degree of care, skill and diligence commonly possessed and exercised by a member of the legal community.

71.     Plaintiffs fully and faithfully performed their obligation to Abrams, Fensterman and the Firm arising out of their attorney-client relationship.

72.     Defendants Abrams, Fensterman and the Firm materially breached their legal and contractual obligations owed to Plaintiffs in failing to adequately advise Plaintiffs in connection with their investments in MYZIVA.

73.     Defendants Abrams, Fensterman and the Firm materially breached their legal and contractual obligations owed to Plaintiffs in failing to adequately advise Plaintiffs in connection with their investments in MYZIVA by inducing Plaintiffs to execute the Share Abandonment Agreements without consideration and in furtherance of defendants' Abrams, Fensterman and the Firm's personal benefit to the detriment of Plaintiffs.

74.     Defendants' Abrams, Fensterman and the Firm breached their fiduciary duty to Plaintiffs by failing to conduct the requisite due diligence in connection with Plaintiffs' investments and Mr. Morrell's loan.

75.     Defendants' Abrams, Fensterman and the Firm breached their fiduciary duty and committed malpractice against Plaintiffs when they placed their own self-interest ahead of Plaintiffs.

76.     Defendants' Abrams, Fensterman and the Firm committed malpractice when they induced Mr. Morrell to loan $400,000.00 to MYZIVA when they knew that MYZIVA had no intention to repay the loan.

77.     Defendants' Abrams, Fensterman and the Firm's conduct was wanton, reckless, careless, and in violation of the New York Rules of Professional Conduct.

78.     Mr. Morrell would not have loaned the $400,000.00 and Plaintiffs would not have invested in MYZIVA had Plaintiffs known about defendants' Abrams, Fensterman and the Firm's undisclosed intent not to perform their professional duties as their attorneys.

D714046v3                                          10

79.     Plaintiffs would not have executed the share abandonment agreements had Plaintiffs known about defendants' Abrams, Fensterman and the Firm's undisclosed intent to advance their own pecuniary interest ahead of Plaintiffs' in violation of the fiduciary duties owed to Plaintiffs.

80.     The conduct of defendants Abrams, Fensterman and the Firm constitute legal malpractice, which has caused and continues to cause substantial damage to Plaintiffs.

81.     By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than the sum of $600,000.00, together with interest thereon and punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Fraud in the Inducement—As Against Abrams, Fensterman and the Firm)

82.     Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

83.     Defendants Abrams, Fensterman and the Firm made material misrepresentations and omissions of material fats in connection with Mr. Morrell's loan and Plaintiffs' investments.

84.     Defendants Abrams, Fensterman and the Firm fraudulently induced Plaintiffs to execute the share abandonment agreements to further their own self-interest.

85.     Defendants Abrams, Fensterman and the Firm fraudulently induced MR. Morrell to issue the loan.

86.     Defendants Abrams, Fensterman and the Firm knew of MYZIVA's undisclosed intent not to satisfy Mr. Morrell's loan or invest Plaintiffs' funds as promised.

87.     Mr. Morrell would not have issued the loan had it known of defendants' Abrams, Fensterman and the Firm's knowledge of MYZIVA's undisclosed intent not to satisfy the loan.

D714046v3                                              11

88.     Plaintiffs would not have executed the share abandonment agreements had they known of defendants' Abrams, Fensterman and the Firm's undisclosed intent to defraud Plaintiffs.

89.     By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than $600,000.00, together with interest thereon and punitive damages.

## AS AND FOR A SIXTH CAUSE OF ACTION
(Accounting—As Against Defendants)

90.     Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

91.     By reason of the foregoing, Plaintiffs are entitled to a full accounting of Defendants' income, dividends, bonuses, expenses, benefits and other profits and monies Defendants received for their own benefit, to the detriment of Plaintiffs, including, without limitation, an accounting of Defendants' profits and for damages in an amount to be determined at trial but in no event less than the sum of $600,000.00, together with interest thereon and punitive damages.

92.     Plaintiffs have no adequate remedy at law.

**WHEREFORE**, Plaintiffs request that judgment be entered against the Defendants, as follows:

i.        On the First Cause of Action, awarding plaintiff Scott Morrell compensatory damages against Defendants in an amount to be determined at trial, but in no event less than the sum of $400,000.00, together with interest thereon;

ii.        On the Second Cause of Action, awarding Plaintiffs compensatory damages against Defendants in an amount to be determined at trial, but in no event less than the sum of $200,000.00, together with interest thereon;

iii.        On the Third Cause of Action, awarding Plaintiffs compensatory damages against defendants Abrams and Fensterman in an amount to be determined at trial, but in no event less than the sum of $600,000.00, together with interest thereon and punitive damages;

iv.        On the Fourth Cause of Action, awarding Plaintiffs compensatory damages against defendants Abrams, Fensterman and the Firm in an amount to be determined at trial, but in no event less than the sum of $600,000.00, together with interest thereon and punitive damages;

v.        On the Fifth Cause of Action, awarding Plaintiffs compensatory damages against defendants Abrams, Fensterman and the Firm in an amount to be determined at trial, but in no event less than the sum of $600,000.00, together with interest thereon and punitive damages;

vi.        On the Sixth Cause of Action, an accounting by Plaintiffs of Defendants' income, dividends, bonuses, expenses and other profits and monies Defendants received for their benefit, and a judgment for Plaintiffs awarding compensatory damages against Defendants in an amount to be determined at trial, but in no event less than the sum of $600,000.00, together with interest thereon and punitive damages.

13

D714046v3

vii.      On all Causes of Action, costs, disbursements and attorneys' fees of this action.

Dated: Garden City, New York
       August 4, 2010

                                    JASPAN SCHLESINGER LLP
                                    *Attorneys for Plaintiffs*

By:                           
                                  Steven R. Schlesinger
                                  Michael A. Leon
                                  Jared A. Kasschau
                                  300 Garden City Plaza
                                  Garden City, New York 11530
                                  (516)746-8000

<u>**VERIFICATION**</u>

STATE OF NEW YORK     )
                                ) ss.:
COUNTY OF NASSAU     )

     **SCOTT MORRELL**, being duly sworn, deposes and says:

     I am one of the plaintiffs in the above-entitled action.  I have read the foregoing **VERIFIED COMPLAINT** and know the contents thereof; and the same is true to my knowledge, except as to the matters therein stated to be alleged upon information and belief and, as to those matters, I believe them to be true.  The basis of my knowledge is the books and records of the Plaintiffs and/or personal knowledge.

                                                        **SCOTT MORRELL**

Sworn to before me this
_4th_ day of August, 2010.

_____
Notary Public

JACKLINE B. DUCHENE
Notary Public, State of New York
No. 01DU6180907
Qualified in Nassau County
Commission Expires ___2 - 12 - 11___

JAK/D714046v3/M056348/C0151240

EXHIBIT "A"

MYZIVA
☒005

# STOCK AND MEMBERSHIP INTEREST PURCHASE AGREEMENT

**STOCK AND MEMBERSHIP INTEREST PURCHASE AGREEMENT** (this "Agreement") made as of September 30, 2002 by and between **THE GOLDEN GOSLINGS, INC.** d/b/a **MYZIVA**, a New York corporation with an address at 1111 Marcus Avenue, Suite 107, Lake Success, New York 11042 (the "Company"), **MZ CONSULTING COMPANY, LLC**, a New York limited liability company with an address at 1111 Marcus Avenue, Suite 105, Lake Success, New York 11042 ("MZ Consulting"), **MZ NATIONAL, LLC**, a New York limited liability company with an address at 1111 Marcus Ave., Suite 105, Lake Success, New York 11042 ("MZ National", and together with the Company and MZ Consulting, the "Sellers", and each, a "Seller" ) and **SCOTT MORREL**, an individual residing at 152 The Knoll, Syosset, New York 11791 (the "Purchaser").

## RECITALS

**WHEREAS**, the Company desires to sell to the Purchaser, and the Purchaser desires to purchase from the Company, ten (10) shares of the common stock of the Company, no par value (the "Shares"), which shall represent five percent (5%) of the Company's issued and outstanding common stock, upon the terms and conditions as hereinafter set forth; and

**WHEREAS**, The Golden Goslings II, Inc., a New York corporation and the Managing Member of each of MZ National and MZ Consulting ("GG II"), currently owns: (a) seventy-eight percent (78%) of the membership interests of MZ National; and (b) fifty percent (50%) of the membership interests of MZ Consulting; and

**WHEREAS**, MZ National desires to sell to the Purchaser, and the Purchaser desires to purchase from MZ National, a five percent (5%) membership interest in MZ National (the "MZ National Interest"); and

**WHEREAS**, MZ Consulting desires to sell to the Purchaser, and the Purchaser desires to purchase from MZ Consulting, a five percent (5%) membership interest in MZ Consulting (the "MZ Consulting Interest", and together with the MZ National Interest, the "Membership Interests"); and

**WHEREAS**, the Sellers desire to allow the Purchaser to participate as an investor in certain ventures the Sellers may undertake following the date hereof.

**NOW, THEREFORE**, in consideration of the mutual covenants herein contained, the parties agree as follows:


1.   **Purchase and Sale of Shares, Membership Interests and Future Participation Rights**.

    (a)   **Purchase of Shares**.  Subject to the terms and conditions of this Agreement, the Company does hereby sell, transfer, assign and convey to the Purchaser, and the Purchaser hereby agrees to purchase at the Closing (as hereinafter defined), the Shares, free and clear of all Liens (as defined in Section 5(b), below).

    (b)   **Purchase of MZ National Interest**.  Subject to the terms and conditions of this Agreement, MZ National does hereby sell, transfer, assign and convey to the Purchaser and the Purchaser hereby agrees to purchase at the Closing, the MZ National Interest, free and clear of all Liens.

    (c)   **Purchase of MZ Consulting Interest**.  Subject to the terms and conditions of this Agreement, MZ Consulting does hereby sell, transfer, assign and convey to the Purchaser and the Purchaser hereby agrees to purchase at the Closing, the MZ Consulting Interest, free and clear of all Liens; provided, however, that the MZ Consulting Interest purchased herein shall not entitle the Purchaser to recognize any benefit with respect to income that may be received by MZ Consulting after the date hereof that is a result of services rendered by MZ Consulting prior to the date hereof.

    (d)   **Future Rights**.  Sellers and the Purchaser agree that the Purchaser shall be entitled to acquire a five percent (5%) interest as a shareholder, member or partner, as the case may be, in any and all ventures and/or strategic relationships directly or indirectly controlling, controlled by or under common control with, any Seller that such Seller may enter into after the date hereof (each, an "Affiliated Entity"); provided, however, that this Section 1(d) shall only apply to an Affiliated Entity that markets, promotes, licenses, sells, improves or is otherwise related, directly or indirectly, to the technology previously developed and currently licensed by the Sellers.

2.   **Purchase Price**.  The aggregate purchase price for the Shares, the MZ National Interest and the MZ Consulting Interest shall be One Hundred Thousand Dollars ($100,000.00) (the "Purchase Price"), which amount has been paid prior to the date hereof and the receipt of which is hereby acknowledged by the Sellers.

3.   **Advance Amount**.  In addition to the Purchase Price and as further consideration for the rights and interests purchased by the Purchaser in Section 1, above, the Purchaser hereby agrees to advance the Sellers Four Hundred Thousand Dollars ($400,000.00) (the "Advance Amount").  The Purchaser and the Sellers hereby acknowledge and agree that: (i) One Hundred Thousand Dollars ($100,000.00) of the Advance Amount has been paid by Purchaser prior to the date hereof, the receipt of which is hereby acknowledged by the Sellers; and (ii) the balance of the Advance Amount shall be paid simultaneously with the execution hereof by wire transfer of immediately available

2

funds, by check or in such other manner as the parties may agree. Interest shall accrue on the Advance Amount at a rate per annum equal to eight percent (8%), which interest shall not be compounded on any periodic basis but will be calculated on a simple basis. The Advance Amount, together with any pro rata portion of the interest, shall be repaid by Sellers to the Purchaser in the following manner:

(a)    At any time the Sellers make a payment of principal to State Bank of Long Island ("State Bank") in accordance with the terms and conditions of those certain Promissory Notes by and among Howard Fensterman, Robert Fensterman and Robert Abrams (collectively, as borrower) and State Bank, each dated as of September 17, 2002, in an aggregate amount of $925,000 (together, and as the same may be modified or amended, the "Loan Agreement") (each, a "State Bank Payment"), the Sellers shall pay to the Purchaser an amount equal to the sum of: (A) the Advance Amount Percentage (as defined below) multiplied by the remaining unpaid balance of the Advance Amount at the time of each such State Bank Payment; and (B) the Advance Amount Percentage multiplied by the amount of accrued but unpaid interest on the Advance Amount at the time of each such State Bank Payment. As used herein, the "Advance Amount Percentage" shall be a fraction, expressed as a percentage, the numerator of which is the amount of the State Bank Payment and the denominator of which shall be the balance of the amount due and payable pursuant to the Loan Agreement prior to each such State Bank Payment. For example (and for illustrative purposes only), if Sellers make a $10,000 payment to State Bank that reduces the outstanding balance due to State Bank from $100,000 to $90,000, then the Advance Amount Percentage shall be equal to $10,000/$100,000, or ten percent (10%). If the unpaid balance of the Advance Amount at the time of such State Bank Payment is $100,000 and the amount of accrued but unpaid interest on the Advance Amount at such time is $10,000, then Sellers shall make a payment to the Purchaser equal to the sum of: (A) ten percent (10%) x $100,000 = $10,000 and (B) Ten Percent (10%) x $10,000 = $1,000, for a total payment of $11,000.

(b)    Notwithstanding the foregoing, if at any time Sellers repay the entire unpaid balance and all accrued and unpaid interest due under the Loan Agreement (a "Final Payment"), then Sellers shall repay the entire remaining unpaid balance of the Advance Amount and all accrued and unpaid interest thereon due to Purchaser at the time of such Final Payment. The entire amount of any accrued and unpaid interest due on the Advance Amount shall also be paid when the unpaid balance of the Advance Amount is paid back in full.

(c)    In the event that the Advance Amount, plus the accrued and unpaid interest thereon, is not fully repaid by Sellers in accordance with subparagraphs (a) and (b) above on or before the fifth (5th) anniversary of the date hereof (the "Final Payment Date"), the Sellers shall repay the entire remaining balance of the Advance Amount, including all accrued and unpaid interest thereon, on the Final Payment Date.

3

4.    Time and Place of Closing.  The closing (the "Closing") of the transactions contemplated by this Agreement is taking place simultaneously with the execution of this Agreement (the "Closing Date").

5.    Closing Deliveries.

   (a)    Purchaser's Closing Deliveries. Simultaneously herewith, the Purchaser shall execute and deliver to Sellers, the following:

      (i)    Cash Payment;

      (ii)    Advance Amount;

      (iii)    an executed counterpart of the Shareholders' Agreement of the Company;

      (iv)    an executed counterpart of the Operating Agreement of MZ National;

      (v)    an executed counterpart of the Operating Agreement of MZ Consulting; and

      (vi)    such other instruments and documents, in form and substance satisfactory to Sellers, as Sellers shall have reasonably requested.

   (b)    Sellers' Closing Deliveries. Simultaneously herewith, each Seller shall execute and deliver to the Purchaser, the following:

      (i)    the Company shall deliver a stock certificate representing the Shares, duly registered in the name of the Purchaser;

      (ii)    MZ National shall deliver a Certificate of Membership Interest representing the MZ National Interest, duly registered in the name of the Purchaser;

      (iii)    MZ Consulting shall deliver a Certificate of Membership Interest representing the MZ Consulting Interest, duly registered in the name of the Purchaser; and

      (iv)    such other instruments and documents, in form and substance satisfactory to the Purchaser as the Purchaser shall have reasonably requested.

4



**6.** <u>Representations and Warranties of the Sellers</u>. Each Seller represents and warrants to the Purchaser as follows:

    (a)   <u>Capitalization of the Company</u>.

        (i)   The authorized Capital Stock of the Company consists of two hundred (200) shares of common stock, without par value ("Common Stock"), of which one hundred (100) shares are currently issued and outstanding. All outstanding shares of Common Stock are (or, in the case of the Shares to be issued concurrently herewith, will, when issued, be) duly authorized, validly issued, fully paid and non-assessable. Except as provided in the Shareholders' Agreement of the Company, there are no: (A) voting trusts or other agreements or understanding with respect to the voting of the Common Stock; (B) outstanding options, warrants or other rights to acquire from the Company, and no obligation for the Company to issue, any capital stock or securities convertible into or exchangeable for capital stock or other voting securities of the Company; or (C) outstanding obligations of the Company to repurchase, redeem or otherwise acquire any securities of the Company.

        (ii)   All membership interests presently issued by MZ National are (or, in the case of the MZ National Interest to be issued concurrently herewith will, when issued be) duly authorized validly issued, fully paid and non-assessable. Except as provided in the Operating Agreements of MZ National, and except as may be provided herein, there are no: (A) voting trusts or other agreements or understanding with respect to the voting of the membership interests of MZ National; (B) outstanding options, warrants or other rights to acquire from MZ National, and no obligation for MZ National to issue, any membership interests or securities convertible into or exchangeable for membership interests of MZ National; or (C) outstanding obligations of MZ National repurchase, redeem or otherwise acquire any of its membership interests.

        (iii)   All Membership Interests presently issued by MZ Consulting are (or, in the case of the MZ Consulting Interest to be issued concurrently herewith will, when issued be) duly authorized, validly issued, fully paid and non-assessable. Except as provided in the Operating Agreements of MZ Consulting, and except as may be provided herein, there are no: (A) voting trusts or other agreements or understanding with respect to the voting of the membership interests of MZ Consulting; (B) outstanding options, warrants or other rights to acquire from MZ Consulting, and no obligation for MZ Consulting to issue, any membership interests or securities convertible into or exchangeable for membership interests of MZ Consulting; or (C) outstanding obligations of MZ Consulting repurchase, redeem or otherwise acquire any of its membership interests.

5

(b)  **Title to Shares and Membership Interests.**  Upon consummation of the transactions contemplated herein, good and marketable title to the Shares and the Membership Interests (and all beneficial and record ownership therein) will pass to the Purchaser, free and clear of all liens, charges, security interests, encumbrances, pledges, restrictions and claims of every kind (collectively, "Liens").

(c)  **Organization and Standing.**

    (a)  The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of New York. The Company has all requisite power and authority and has all necessary approvals and authorizations to own the assets owned by it and to conduct the business presently being conducted by it.

    (b)  Each of MZ National and MZ Consulting is a limited liability company duly formed, validly existing and in good standing under the laws of the State of New York. Each has the requisite power and authority and has all necessary approvals and authorizations to own the assets owned by each of them and to conduct their respective business presently being conducted by each of them.

(d)  **Authority; Binding Effect.**  Each Seller has full legal right, power and authority to execute and deliver and perform this Agreement and all related transaction documents and to consummate the transactions contemplated herein and therein. Such execution, delivery and performance has been duly authorized by all necessary corporate or limited liability company action, as the case maybe, on the part of each Seller. This Agreement and all related transaction documents constitute the valid and binding obligations of each Seller, enforceable against each Seller in accordance with their respective terms.

(e)  **Litigation Matters.**  There are no claims, actions, suits or proceedings or arbitrations, either administrative or judicial, pending, or overtly threatened against or affecting any Seller, the Shares, the Membership Interests, or any Sellers' ability to consummate the transactions contemplated herein, at law or in equity or otherwise, before or by any court or governmental agency or body, domestic or foreign, or before an arbitrator of any kind and to the knowledge of each Seller, there are no reasonable grounds for the basis of any such claim, action, suit or proceeding.

(f)  **Taxes.**  There are no material tax obligations owed by any Seller with respect to the period prior to and through the Closing Date.

(g)  **No Conflicts; Violations; Consents.**  The execution and delivery of this Agreement and the related transaction documents and the consummation of the transactions contemplated hereby and thereby: (i) do not contravene any provision of: (A) the Company's Certificate of Incorporation or By-laws, or (B) the Articles of Organization or operating agreements of MZ National and MZ Consulting; (ii) will

6

☑011

not violate any statute, rule, regulation, order of decree of any public body or authority by which any Seller is bound; (iii) will not result in a violation or breach of, or constitute a default under, any license, franchise, permit, indenture, agreement or other instrument to which any Seller is bound; or (iv) do not require any Seller to obtain any consent, approval or action of or waiver from, or make any filing with, or give any notice to, any person.

(h)     **Brokers or Finders**. No agent, broker, person or firm acting on behalf of any Seller is, or will be, entitled to any commission or broker's or finder's fees from any of the parties hereto, or from any person controlling, controlled by or under common control with any of the parties hereto, in connection with any of the transactions contemplated by this Agreement.

(i)     **No Untrue Statement**. No representations or warranties made by any Seller in this Agreement, or any document furnished or executed in connection with this Agreement, contain any untrue statement of material fact or omit to state a material fact necessary to make the statement not misleading in any material respect.

7.     **Representations and Warranties of the Purchaser**. The Purchaser represents and warrants to the Sellers as follows:

(a)     **Authority; Binding Effect**. The Purchaser has full legal right, power and authority to execute and deliver this Agreement and all related transaction documents and to consummate the transactions contemplated herein and therein. This Agreement and all related transaction documents constitute the valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms.

(b)     **No Conflicts; Violations; Consents**. The execution and delivery of this Agreement and the related transaction documents and the consummation of the transactions contemplated hereby and thereby: (i) will not violate any statute, rule, regulation, order of decree of any public body or authority by which the Purchaser is bound; (ii) will not result in a violation or breach of, or constitute a default under, any license, franchise, permit, indenture, agreement or other instrument to which, Purchaser is bound; or (iii) do not require the Purchaser to obtain any consent, approval or action of or waiver from, or make any filing with, or give any notice to, any person.

(c)     **Brokers or Finders**. No agent, broker, person or firm acting on behalf of the Purchaser is, or will be, entitled to any commission or broker's or finder's fees from any of the parties hereto, or from any person controlling, controlled by or under common control with any of the parties hereto, in connection with any of the transactions contemplated herein.

(d)     **Investment Interest; Acknowledge of Risk**. The Purchaser acknowledges that: (i) he is purchasing the Shares and Membership Interests herein for his own account, for investment purposes only, and not with the view towards the resale or distribution

7

thereof; (ii) he has sufficient available financial resources to provide adequately for his current needs, including possible personal contingencies and can bear the economic risk of a complete loss of his investment hereunder; (iii) there are substantial risks involved in the Sellers' operations and the Shares and Membership Interests constitute speculative, illiquid investments; and (iv) there is no public market for the Shares or the Membership Interests, nor is it anticipated that such a market will develop in the near future and, consequently, the Purchaser may be required to hold the Shares and the Membership Interests for an indefinite period of time.

(e) <u>No Untrue Statement</u>. No representations or warranties made by the Purchaser in this Agreement, or any document furnished or executed in connection with this Agreement, contain any untrue statement of material fact or omit to state a material fact necessary to make the statement not misleading in any material respect.

8. <u>Certain Covenants and Agreements of the Parties</u>.

(a) <u>Monthly Statements: Consultation</u>. Purchaser shall be entitled to receive from each Seller a monthly report reflecting the business and financial status of each Seller. In addition, Purchaser shall have the right to consult with each Seller's outside accountants and obtain whatever information that Purchaser reasonably requests. Robert Abrams, the President of the Company and GG II, shall conduct a quarterly meeting with the Purchaser in order to consult with and apprize the Purchaser of the status of each Seller's ongoing operations, business and financial condition and prospects.

(b) <u>Best Efforts</u>. Each of the parties agree to use their reasonable best efforts to take, or cause to be taken, all action, to do, or cause to be done, and to assist and cooperate with the other party hereto in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement including, but not limited to: (i) the obtaining of all necessary waivers, consents and approvals from governmental or regulatory agencies or authorities and the making of all necessary registrations and filings (including, but not limited to, filings with governmental or regulatory agencies or authorities, if any) and the taking of all reasonable steps as may be necessary to obtain any approval or waiver from, or to avoid any action or proceeding by, any governmental agency or authority; and (ii) the obtaining of all necessary consents, approvals or waivers from third parties.

(c) <u>Allocation</u>. Sellers and Purchaser acknowledge and agree that the allocation of the Purchase Price amongst the Sellers shall be determined pursuant to a separate agreement entered into among the parties.

9. <u>Survival of Representations and Warranties</u>. The representations and warranties of the Sellers and the Purchaser in this Agreement shall survive the Closing.

8

d.   Indemnification.

(a)   **Indemnification by the Purchaser**.  The Purchaser agrees to indemnify the Sellers against, and hold the Sellers harmless from, any and all losses, liabilities, damages (including any governmental penalty or punitive damages), deficiencies, interest, costs and expenses and any actions, judgments, costs and expenses (including reasonable attorneys' fees and expenses incident to the enforcement of this Section 10 (collectively, "Loss"), arising out of the breach of any representation, warranty, covenant or agreement or obligation of the Purchaser herein.

(b)   **Indemnification by the Sellers**.  Each Seller agrees to indemnify the Purchaser against, and hold Purchaser harmless from, any and all Loss arising out of the breach of any representation, warranty, covenant, agreement or obligation of such Seller herein.

(c)   **Control of Defense of Indemnifiable Claims**.  Any party seeking indemnification under this Agreement (each, an "Indemnitee") shall give the party from whom indemnification is sought (the "Indemnitor") prompt written notice of each claim for which it seeks indemnification. Failure to give such prompt notice shall not relieve Indemnitor of its indemnification obligation; provided that such indemnification obligation shall be reduced by any damages the Indemnitor demonstrates it has suffered resulting from a failure to give prompt notice hereunder. The Indemnitor, at its own expense, shall be entitled to participate in the defense of such claim. If at any time the Indemnitor acknowledges in writing that the claim is fully indemnifiable by it under this Agreement, the Indemnitor shall have the right to assume control of the defense of such claim at its own expense. If the Indemnitors do assume control of the defense of any such claim in accordance with the foregoing sentence, then: (x) the Indemnitor shall not defend the claim for which indemnification is being sought in any manner that would likely have a material adverse effect on the Indemnitee or on any relationship that the Indemnitee may have with any customers, vendors, suppliers or others, and (y) the Indemnitee shall not settle such claim without the written consent of the Indemnitor, which consent shall not be unreasonably withheld, delayed or conditioned. Nothing contained in this Section 10(c) shall prevent either party from assuming control of the defense and/or settling any claim against it for which indemnification is not sought under this Agreement.

11.   **Miscellaneous Provisions**.

(a)   **Governing Law**.   This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to its conflicts of law provisions.

(b)   **Severability**  The provisions of this Agreement shall be severable, and if any provisions shall be prohibited by law, or invalid, or unenforceable in whole or in part for any reason, the remaining provisions shall remain in full force and effect.

(c)   **Entire Agreement**  This Agreement contains the entire Agreement between Sellers

9



and the Purchaser with respect to the subject matter hereof. Sellers and the Purchaser expressly agree that there are no promises, agreements, conditions, undertakings, warranties, or representations, oral or written, expressed or implied between them, other than as set forth herein.

(d) **Non-Waiver**   Failure of either party to this Agreement to object to or take affirmative action with respect to any conduct of the other which is violative of the terms hereof, shall not be construed as a waiver thereof or of any future breach or subsequent misconduct.

(e) **Section Headings**   The section headings used herein are for convenience of reference only and shall not limit or otherwise affect any of the terms or provisions hereof.

(f) **Assignment**   Neither party hereto shall assign this Agreement or delegate its obligations hereunder without the prior written consent of the other party hereto in each instance.   Notwithstanding, the foregoing, all covenants, conditions, and obligations contained herein shall be binding upon, and shall inure to the benefit of, the respective successor and assigns of each Seller and the Purchaser.

(g) **Notices**   All notices, requests, demands and other communications under or in connection with this Agreement shall be given in writing and shall be deemed to have been given or made; if by hand, immediately upon delivery; if by telex, telecopier or similar electronic device, two hours after sending; if by Federal Express, Express Mail or any other overnight service, the first business day after dispatch; or if mailed by certified mail return receipt requested, two business days after delivery or return of the notice to sender marked "unclaimed". All notices shall be delivered or mailed to the parties at the following address (or to such other address as either party shall designate by notice in accordance with the provisions to this paragraph):

If to the Purchaser:

Scott Morrel
152 The Knoll
Syosset, New York 11791
Fax No.:

If to Sellers:

The Golden Goslings, Inc.
5 Dakota Drive
Suite 206
Lake Success, New York 11042
Attention: Howard Fensterman, Esq.
Fax:(516) 328-6638

(h) **Modification**   This Agreement shall not be modified or amended except by

10

a written document executed by both parties.

(i)     **Counterparts**   For the convenience of the parties hereto, this Agreement may be executed in counterparts and all such counterparts shall, when taken together, constitute one and the same agreement.

## [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

11

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLERS:

THE GOLDEN GOSLINGS, INC. d/b/a MYZIVA

By: _____
    Robert Abrams, President

MZ NATIONAL, LLC

By: The Golden Goslings II, Inc., as Manager

   By: _____
       Robert Abrams, President

MZ CONSULTING COMPANY, LLC

By: The Golden Goslings II, Inc., as Manager

   By: _____
       Robert Abrams, President

PURCHASER:

_____
Scott Morrel

By its signature below, The Golden Goslings II, Inc. hereby acknowledges and agrees that the consummation of the transactions contemplated by this Agreement will result in the immediate dilution of its interest in both of MZ National, LLC and MZ Consulting Company, LLC.

THE GOLDEN GOSLINGS II, INC.

By: _____
    Robert Abrams, President

12

EXHIBIT "B"

## SHARE ABANDONMENT AGREEMENT

SHARE ABANDONMENT AGREEMENT (this "Agreement"), made effective as of December 31, 2007, by and between The Golden Goslings, Inc., a New York corporation having an address at 1111 Marcus Avenue, Suite 107, Lake Success, New York 11042 (the "Corporation") and each of the persons identified on Exhibit A attached hereto (all such persons collectively referred to as the "Shareholders" and individually referred to as a "Shareholder").

### RECITALS

WHEREAS, each Shareholder is the owner of the number of shares of common stock of the Corporation set forth opposite such Shareholder's name on Exhibit A attached hereto, which in the aggregate amount to _____ shares of common stock and represent ___% of the Corporation's issued and outstanding shares of common stock (collectively, the "Shareholders' Shares"); and

WHEREAS, the Corporation has no business operations, and Shareholders no longer desire to be shareholders of the Corporation;

WHEREAS, upon the terms and conditions as hereinafter set forth, Shareholders desire to surrender to the Corporation, and the Corporation desires to accept and acquire from Shareholders, the Shareholders' Shares.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

1.    Surrender of the Shareholders' Shares.  Subject to the terms and conditions of this Agreement, at the Closing (as hereinafter defined), each Shareholder shall surrender, transfer, assign and convey, and the Corporation shall accept and acquire from such Shareholder, all of such Shareholder's right, title, and interest in and to the Shareholders' Shares, and by doing so Shareholders shall be deemed to have assigned all of their respective right, title and interest in and to the Shareholders' Shares to the Corporation.   At the Closing (hereafter defined), Shareholders shall execute and deliver to the Corporation stock certificates representing the Shareholders' Shares accompanied by stock powers duly executed in favor of Corporation, in proper form for transfer, together with any other documents that are necessary to transfer to the Corporation good and marketable title to the Shareholders' Shares.

2.    Consideration.  In consideration for the surrender of the Shareholders' Shares, the Corporation has paid to the Shareholders Ten Dollars ($10.00) in the aggregate and other good and valuable consideration, receipt of which is hereby acknowledged.

3.    Place and Date of Closing.  The closing of the transactions contemplated herein (the "Closing") shall take place at the offices of the Corporation at 1111 Marcus Avenue, Suite 107, Lake Success, New York 11042, or at such other location as may be agreed to by the parties, on the date that this Agreement shall have been duly executed by all of the parties hereto (the

-1-

"Closing Date").

4.  Resignation.  Effective immediately, each Shareholder hereby resigns from all positions, if any, held by such Shareholder as officer, director, and employee of the Corporation.

5.  Miscellaneous Provisions.

5.1  Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to its conflicts of law provisions.

5.2  Entire Agreement.  This Agreement sets forth the entire agreement and understanding of the parties in respect of the transactions contemplated hereby and supersedes all prior agreements, arrangements and understandings of the parties relating to the subject matter hereof.  No representation, promise, inducement, waiver of rights, agreement or statement of intention has been made by any of the parties which is not expressly embodied in this Agreement.

5.3  Further Assurances.  Shareholder agrees that, from time to time after the Closing Date, he will execute and deliver such further documents, instruments, affidavits or acknowledgments, and shall assist and cooperate with Corporation in doing all things necessary, in the most expeditious manner practicable, as are reasonably requested by Corporation to effect the transactions contemplated hereby.

5.4  Waivers.  The failure of any party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same.  No waiver by any party of any condition, or the breach of any term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other term, covenant, representation or warranty of this Agreement.

5.5  Notices.  All notices, requests, demands and other communications under or in connection with this Agreement shall be given in writing and shall be deemed to have been given or made: if by hand, immediately upon delivery; if by Federal Express, Express Mail or any other overnight service, the first business day after dispatch; or if mailed by certified mail return receipt requested, three business days after delivery or return of the notice to sender marked "unclaimed".  All notices shall be delivered or mailed to the party to whom the same is so given or made at the following address (or to such other address as the intended recipient shall have designated by notice in accordance with the provisions to this paragraph): if the intended recipient is the Corporation, to the address for the Corporation set forth in the first paragraph of this Agreement; and if the intended recipient is a Shareholder, to the address of such party set forth in Exhibit A attached hereto.

5.6  Amendments.  This Agreement may be amended, modified, superseded or cancelled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties hereto.

-2-

IN WITNESS WHEREOF, the parties hereto have executed this Share Abandonment Agreement as of the date first above written.

CORPORATION:

THE GOLDEN GOSLINGS, INC.

By: _____

Name: Robert Abrams

Title: President

SHAREHOLDERS:

Name: _____

Name: _____

Name: _____

Name: _____

Name: _____

Name: _____

Name: _____

-3-

<u>EXHIBIT A</u>

<u>TO</u>

<u>SHARE ABANDONMENT AGREEMENT</u>

<u>Name and Address of Shareholder</u>          <u>Number of Shareholders' Shares Owned by Shareholder</u>

Scott Morrell
8 Cove Meadow Lane
Oyster Bay Cove, N.Y. 11771

-4-

**Exhibit "C"**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
----------------------------------------------------------------X
SCOTT MORRELL and ROSELEE MORRELL,

                        Plaintiffs,                    Index No.:    016231/2010

        -against-

                                                       **AMENDED**
THE GOLDEN GOSLINGS, INC. d/b/a                   **VERIFIED COMPLAINT**
MYZIVA, MZ CONSULTING COMPANY, LLC,
MZ NATIONAL, LLC, ROBERT ABRAMS,
HOWARD FENSTERMAN, ABRAMS,
FENSTERMAN, FENSTERMAN, EISMAN,
GREENBERG, FORMATO & EINIGER, LLP,

                        Defendants.
----------------------------------------------------------------X

      Plaintiffs, Scott Morrell and RoseLee Morrell, by and through their attorneys, Jaspan

Schlesinger LLP, as and for their Amended Verified Complaint against defendants, allege as

follows:

## NATURE OF ACTION

      1.      This action arises from the defendants' Robert Abrams, Howard Fensterman, and

the firm of Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP

(collectively the "Attorney Defendants") legal malpractice, fraud, and breach of contract in

connection with a loan made by plaintiff Scott Morrell in the principal amount of $400,000 and,

further, in connection with plaintiffs Scott Morrell and RoseLee Morrell's (collectively the

"Plaintiffs") aggregate investment of $200,000 in defendants The Golden Goslings, Inc. d/b/a

MYZIVA, MZ Consulting Company, LLC, and MZ National, LLC (collectively "MYZIVA").

      2.      Mr. Morrell was induced to issue a $400,000 loan to MYZIVA based upon

material misrepresentations and omission of facts propounded by the Attorney Defendants, who

each had a financial and/or control interest in those companies.

3.      Plaintiffs were further induced and advised by the Attorney Defendants to each invest $100,000 in MYZIVA.

4.      Finally, plaintiffs were induced and advised by the Attorney Defendants to execute Share Abandonment Agreements, which served to extinguish and assign all of their rights, title and interest in MYZIVA, for zero consideration based on material misrepresentations and omissions of fact.

5.      It is alleged and believed that the Attorney Defendants fraudulently induced Mr. Morrell to issue a $400,000 loan and further induced each plaintiff to first invest $100,000 in MYZIVA and then to subsequently execute Share Abandonment Agreements vitiating Plaintiffs' investment in a scheme to improve the defendants' interests in those companies to Plaintiffs detriment.

6.      Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than the sum of $600,000, together with interest thereon and punitive damages.

**PARTIES**

7.      At all relevant times herein, plaintiff Scott Morrell ("Mr. Morrell") is a natural person residing in the County of Nassau, State of New York.

8.      At all relevant times herein, plaintiff RoseLee Morrell ("Ms. Morrell") is a natural person residing in the County of Bergen, State of New Jersey.

9.      Mr. Morrell and Ms. Morrell are collectively referred to as "Plaintiffs".

10.     Upon information and belief and at all relevant times herein, defendant Golden Goslings, Inc., d/b/a MYZIVA ("Golden Goslings"), is a New York corporation with an address located at 1111 Marcus Avenue, Suite 107, Lake Success, New York 11042.

11.     Upon information and belief and at all relevant times herein, defendant MZ Consulting Company, LLC ("MZ Consulting"), is a New York limited liability company with an address located at 1111 Marcus Avenue, Suite 107, Lake Success, New York 11042.

12.     Upon information and belief and at all relevant times herein, defendant MZ National, LLC ("MZ National", together with Golden Goslings and MZ Consulting are collectively referred to as "MYZIVA"), is a New York limited liability company with an address located at 1111 Marcus Avenue, Suite 107, Lake Success, New York 11042.

13.     Upon information and belief and at all relevant times herein, defendant Robert Abrams ("Abrams"), is the President and Chairman of the Board of MYZIVA as well as an attorney duly licensed to practice law before the courts of the State of New York.

14.     Upon information and belief and at all relevant times, defendant Howard Fensterman ("Fensterman"), is an attorney duly licensed to practice law before the courts of the State of New York.

15.     Upon information and belief and at all relevant times herein, defendant Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP (the "Firm"), is a New York limited liability partnership that provides legal services with offices located at 1111 Marcus Avenue, Suite 107, Lake Success, New York 11042.

16.     At all relevant times herein, Abrams was either a partner or of counsel to the Firm.

17.     At all relevant times herein, Fensterman was a partner of the Firm.

18.     Abrams, Fensterman, and Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP are collectively referred to as the "Attorney Defendants".

## FACTS COMMON TO ALL CAUSES OF ACTION

19.   Fensterman and the Firm have acted as Plaintiffs' attorneys since approximately 1988 and have served as Plaintiffs' exclusive attorneys in connection with their business ventures and private affairs up until March 2010.

20.   Plaintiffs have sought the advice and counsel of Fensterman and the Firm in connection with their personal financial investments, specifically including their investment in MYZIVA.

21.   In or around 2002, defendants Fensterman and Abrams solicited Plaintiffs to purchase an interest in MYZIVA, a company that offered internet-based products and information relating to the nursing home industry to both caregivers and consumers.

22.   Upon information and belief, Fensterman and Abrams are founding members of the Golding Goslings and maintain a controlling interest in MYZIVA.

23.   Upon information and belief, Abrams is President and Chairman of the Board of MYZIVA.

24.   Upon information and belief, Fensterman and the Firm serve as legal counsel to MYZIVA and each invested in, provided and/or guaranteed significant loans to MYZIVA or Abrams.

25.   In or around September 2002, Fensterman represented to Mr. Morrell, in sum and substance, that MYZIVA is a great investment opportunity that will succeed based on the Attorney Defendants' connections with the healthcare industry. Fensterman further represented that Abrams was sufficiently experienced and qualified to manage MYZIVA.

26.   Based upon his consultation with Fensterman and Fensterman's representations, Mr. Morrell agreed to loan $400,000 to MYZIVA (the "Loan") and to invest $100,000 in exchange for a 5% interest in MYZIVA (the "Investment").

27.     In or around September 30, 2002, Mr. Morrell was presented with a Stock and Membership Purchase Agreement (the "Purchase Agreement"), which set forth the terms and conditions for the Loan and his $100,000 investment in MYZIVA.

28.     Prior to entering into the Purchase Agreement, Mr. Morrell sought the advice and legal counsel of the Attorney Defendants regarding the Loan, his $100,000 investment, and the terms and conditions of the Purchase Agreement including, *inter alia*, how to protect his right to repayment, which matured on September 30, 2007 (the "Loan Maturity Date"), and to address his concerns regarding MYZIVA's use of the same accountant used by the Firm and Fensterman.

29.     Fensterman advised Mr. Morrell that the terms and conditions of the Purchase Agreement, which included a five year payback clause that he had advised and consulted Mr. Morrell about, were satisfactory. Fensterman and Abrams further assured Mr. Morell that, if he agreed to the terms of the Loan and Investment, MYZIVA would utilize a different accountant.

30.     Based upon the Attorney Defendants' advice and representations, Mr. Morrell executed the Purchase Agreement, which provides, in pertinent part:

> ...
>
> 2.     **Purchase Price**.     The aggregate purchase price for the Shares, the MZ National interest and the MZ Consulting interest shall be One Hundred Thousand Dollars ($100,000) (the "Purchase Price"), which amount has been paid prior to the date hereof and the receipt of which is hereby acknowledged by [MYZIVA].
>
> 3.     **Advance Amount**.     In addition to the Purchase Price and as further consideration for the rights and interests purchased by [Mr. Morrell] in § 1, above, [Mr. Morrell] hereby agrees to advance [MYZIVA] Four Hundred Thousand Dollars ($400,000) (the "Advance Amount"). [Mr. Morrell] and [MYZIVA] hereby acknowledge and agree that (i) One Hundred Thousand Dollars ($100,000.00) of the Advance Amount has been paid by [Mr. Morrell] prior to the date hereof, the receipt of which is hereby acknowledged by [MYZIVA]; and (ii) the balance of the Advance Amount shall be paid simultaneously with the execution hereof by wire transfer of immediately available funds, by check or in such

other manner as the parties may agree.  Interest shall accrue on the Advance amount at a rate per annum equal to eight percent (8%), which interest shall not be compounded on any periodic basis but will be calculated on a simple basis.  The advance amount together with any <u>pro rata</u> portion of the interest, shall be repaid by [MYZIVA] and to [Mr. Morrell] in the following manner:

. . .

(c) In the event that the Advance Amount, plus the accrued and unpaid interest thereon is not fully repaid by [MYZIVA] in accordance with subparagraphs (a) and (b) above on or before the fifth (5th) anniversary of the date hereof (the "Final Payment Date"), [MYZIVA] shall repay the entire remaining balance of the Advance Amount, including all accrued and unpaid interest thereon, on the Final Payment Date.

. . .

8.     <u>Certain Covenants and Agreements of the Parties.</u>

(a) <u>Monthly Statements: Consultation.</u>  [Mr. Morrell] shall be entitled to receive from [MYZIVA] a monthly report reflecting the business and financial status of [MYZIVA].  In addition, [Mr. Morrell] shall have the right to consult with [MYZIVA's] outside accountants and obtain whatever information that [Mr. Morrell] reasonably requests.  Robert Abrams, the President of [Golden Goslings] and GGII, shall conduct a quarterly meeting with [Mr. Morrell] in order to consult with and apprize [him] of the status of [MYZIVA's] ongoing operations, business and financial condition and prospects.

. . .

<u>See</u> Purchase Agreement annexed hereto as Exhibit "A".

31.     In or around June 2005, Ms. Morrell similarly invested $100,000 in MYZIVA based upon the advice and representations of her attorney, Fensterman, regarding the quality and likelihood of success of the investment opportunity.

32.     Mr. Morrell, initially, received distribution checks based on his interest in MZ Consulting, which were sent as enclosures to letters by Fensterman on Firm letterhead and drafted from, on at least one occasion, the Firm's Interest On Lawyers Accounts ("IOLA").

JAK/D732681v2/M056348/C0151240

33.     Subsequent to Plaintiffs' investment, Mr. Morrell was in regular contact with both Fensterman and Abrams in order to address Plaintiffs' legal and business related concerns regarding MYZIVA including, without limitation, MYZIVA's failure to secure an accountant other than the one used by Fensterman and the Firm, as promised by Fensterman and Abrams.

34.     Mr. Morrell also repeatedly consulted with Fensterman regarding how Mr. Morrell could obtain copies of the reports and information reflecting the business and financial status of MYZIVA, which Abrams and MYZIVA failed to provide in contravention to the Purchase Agreement, and requested that Fensterman, as his attorney, obtain copies of the outstanding reports and information.

35.     In addition, Mr. Morrell sought guidance from Fensterman regarding MYZIVA and Abrams' demonstrated inability to meet business related deadlines including, without limitation, MYZIVA product launch dates and scheduled board meetings.

36.     Fensterman, in response, repeatedly assured Mr. Morrell that the Loan, together with interest thereon, would be repaid by the Loan Maturity Date and that Abrams was acting in accordance with MYZIVA's shareholders' best interests.

37.     Upon information and belief, those representations made to Mr. Morrell by Fensterman were known to be false and Fensterman was then aware of the MYZIVA's financial distress and inability to repay the Loan and of Abrams' reckless business decisions.

38.     Upon further information and belief, Fensterman failed to obtain or attempt to obtain any of the reports or other information sought by Mr. Morrell regarding MYZIVA's financial status.

39.     Prior to and during December 2007, the Attorney Defendants, specifically Fensterman and Abrams, repeatedly approached Plaintiffs and pressured each of them to sign a

"Share Abandonment Agreement," which extinguished and assigned all of Plaintiffs' rights, title and interest in MYZIVA. See Share Abandonment Agreement annexed hereto as Exhibit "B".

40.     Fensterman and Abrams each represented to Mr. Morrell that, in exchange for his signing the Share Abandonment Agreement, they would grant him ten percent (10%) of the profits of MYZIVA.com, which they explained was profitable.

41.     Plaintiffs executed the Share Abandonment Agreement, in or around December 2007, based upon the Attorney Defendants' advice and counsel and Fensterman and Abrams' representations.   Neither Mr. Morrell nor Ms. Morrell received any other consideration in exchange for extinguishing all of their rights, title and interest in MYZIVA.

42.     To date, Mr. Morrell has not received any payment in connection with the Loan and is currently owed the principal amount of $400,000, plus interest, which became due and payable on September 30, 2007.   Furthermore, Mr. Morrell was not granted the ten percent (10%) interest in profits promised by Fensterman and Abrams.

43.     It is alleged and believed that the Attorney Defendants induced Plaintiffs to invest in MYZIVA based on material misrepresentations of fact including, without limitation, representations that: (i) MYZIVA would retain an accountant different than the one used by Fensterman and the Firm; (ii) that the Attorney Defendants had connections within the healthcare industry that would facilitate MYZIVA's success; (iii) that Abrams was sufficiently experienced and capable of controlling MYZIVA as President and Chairman of the Board; and, (iv) that MYZIVA would repay the Loan by the Maturity Date.

44.     It is further alleged and believed that the Attorney Defendants induced Plaintiffs to execute Share Abandonment Agreements by exploiting their positions as Plaintiffs' attorneys

and by falsely promising Mr. Morrell a "side deal" wherein he would receive ten percent (10%) of any revenue generated by MYZIVA.com, which they indicated was profitable.

45.     Finally, it is alleged and believed that the actions taken by the Attorney Defendants, as described above, were done with the intent to benefit the Attorney Defendants and MYZIVA' interests to Plaintiffs' detriment.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract—As Against MYZIVA, Abrams and Fensterman)

46.     Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

47.     The Purchase Agreement is a valid and binding agreement.

48.     Mr. Morrell loaned $400,000 to MYZIVA pursuant to the terms of the Purchase Agreement.

49.     Mr. Morrell performed all of his obligations under the Purchase Agreement.

50.     Defendants Abrams and Fensterman are founding members of Golden Goslings and maintain a controlling interest in MYZIVA.

51.     MYZIVA, Abrams, and Fensterman breached the material terms of the Purchase Agreement by failing and refusing to satisfy the principal balance due under the loan in the amount of $400,000, plus interest.

52.     By reason of the foregoing, Mr. Morrell has been damaged in an amount to be determined at trial, but in no event less than the sum of $400,000, together with interest thereon.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Unjust Enrichment—As Against the Attorney Defendants and MYZIVA)

53.     Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

54.    Plaintiffs extinguished all of their rights, title and interest in MYZIVA upon executing the Share Abandonment Agreements for zero consideration based upon the promise that Mr. Morrell would receive a "side deal" wherein he would receive ten percent (10%) of any revenue generated by MYZIVA.com, which Abrams and Fensterman represented was profitable.

55.    Plaintiffs performed all of their obligations under the Share Abandonment Agreements.

56.    Mr. Morrell has not been awarded any payments in connection with MYZIVA.com.

57.    Upon information and belief, the Attorney Defendants induced Plaintiffs to abandon their rights, title, and interest in MYZIVA for zero consideration in furtherance of their own selfish interests and the interests of defendant MYZIVA including, without limitation, to facilitate repayment and/or renegotiation of the loans which were made or guaranteed by the Attorney Defendants on behalf of MYZIVA.

58.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than the sum of $200,000, together with interest thereon.

### AS AND FOR A THIRD CAUSE OF ACTION
(Breach of Fiduciary Duty—As Against the Attorney Defendants)

59.    Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

60.    The Attorney Defendants owed Plaintiffs the fiduciary duties of care, loyalty and good faith.

61.    The Attorney Defendants breached their fiduciary duties by inducing Mr. Morrell to issue the $400,000 Loan based on material misrepresentations and omissions of material fact.

62.    The Attorney Defendants breached their fiduciary duties by inducing Plaintiffs to invest $200,000 in MYZIVA based on material misrepresentations and omissions of material fact.

63.    The Attorney Defendants breached their fiduciary duties owed to Plaintiffs when they induced Plaintiffs to abandon their rights, title, and interest in MYZIVA for zero consideration in furtherance of their own selfish interests including, without limitation, to facilitate repayment and/or renegotiation of the loans which they made or guaranteed on behalf of MYZIVA.

64.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than the sum of $600,000, together with interest thereon and punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
(Malpractice—As Against the Attorney Defendants)

65.    Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

66.    At all relevant times, defendants Abrams and Fensterman were licensed to practice law in the State of New York.

67.    At all relevant times, defendants Abrams and Fensterman were employed by the Firm.

68.    At all relevant times, the Attorney Defendants provided legal services to Plaintiffs in connection with their investments in MYZIVA and Mr. Morrell's Loan.

69.    The Attorney Defendants had a legal and contractual obligation, as Plaintiffs' attorneys, to faithfully perform professional and legal duties on behalf of Plaintiffs with the

requisite degree of care, skill and diligence commonly possessed and exercised by a member of the legal community.

70.     Plaintiffs fully and faithfully performed their obligation to the Attorney Defendants arising out of their attorney-client relationship.

71.     The Attorney Defendants materially breached their legal and contractual obligations owed to Plaintiffs by failing to adequately advise Plaintiffs in connection with their investments in MYZIVA.

72.     The Attorney Defendants breached their fiduciary duties owed to Plaintiffs when they induced Plaintiffs to abandon their rights, title, and interest in MYZIVA for zero consideration by exploiting their positions as Plaintiffs' attorneys and by falsely promising Mr. Morrell a "side deal" wherein he would receive ten percent (10%) of any revenue generated by MYZIVA.com in order to further their own interests to the detriment of Plaintiffs.

73.     The Attorney Defendants breached their fiduciary duty to Plaintiffs by failing to conduct the requisite due diligence in connection with Plaintiffs' investments and the Loan.

74.     The Attorney Defendants breached their fiduciary duty and committed malpractice against Plaintiffs when they placed their own self-interest ahead of Plaintiffs.

75.     The Attorney Defendants' conduct was wanton, reckless, careless, and in violation of the New York Rules of Professional Conduct.

76.     Mr. Morrell would not made the Loan and Plaintiffs would not have invested in MYZIVA had Plaintiffs known about the Attorney Defendants undisclosed intent not to perform their professional duties as their attorneys.

77.     Plaintiffs would not have executed the Share Abandonment Agreements had Plaintiffs known about the Attorney Defendants undisclosed intent to advance their own interests ahead of Plaintiffs' in violation of the fiduciary duties owed to Plaintiffs.

78.     The conduct of the Attorney Defendants constitutes legal malpractice, which has caused and continues to cause substantial damage to Plaintiffs.

79.     By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than the sum of $600,000, together with interest thereon and punitive damages.

### AS AND FOR A FIFTH CAUSE OF ACTION
(Fraud in the Inducement—As Against the Attorney Defendants and MYZIVA)

80.     Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

81.     The Attorney Defendants made material misrepresentations and omissions of material facts in connection with the Loan and Plaintiffs' investments including, without limitation, that: (i) MYZIVA would retain an accountant different than the one used by Fensterman and the Firm; (ii) that the Attorney Defendants had connections within the healthcare industry that would facilitate MYZIVA's success; (iii) that Abrams was sufficiently experienced and capable of managing MYZIVA; and, (iv) that MYZIVA would repay the Loan by the Maturity Date.

82.     The Attorney Defendants fraudulently induced Plaintiffs to execute the Share Abandonment Agreements for zero consideration to further their own self-interest by exploiting their positions as Plaintiffs' attorneys and by falsely promising Mr. Morrell a "side deal" wherein he would receive ten percent (10%) of any revenue generated by MYZIVA.com in order to further their own interests to the detriment of Plaintiffs.

83.   Mr. Morrell would not have issued the Loan had he known of the Attorney Defendants' knowledge that: (i) MYZIVA would not retain an accountant different than the one used by Fensterman and the Firm; (ii) that the Attorney Defendants did not have connections within the healthcare industry that would facilitate MYZIVA's success; (iii) that Abrams was not sufficiently experienced and capable of managing MYZIVA; and, (iv) that MYZIVA would not repay the Loan by the Maturity Date.

84.   Plaintiffs would not have executed the Share Abandonment Agreements for zero consideration had they known that the Attorney Defendants' promise to offer Mr. Morrell a "side deal" wherein he would receive ten percent (10%) of any revenue generated by MYZIVA.com was a sham and was made only to further the defendants' interests to the detriment of Plaintiffs.

85.   By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than $600,000, together with interest thereon and punitive damages.

## AS AND FOR A SIXTH CAUSE OF ACTION
(Accounting—As Against the Attorney Defendants and MYZIVA)

86.   Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth at length herein.

87.   By reason of the foregoing, Plaintiffs are entitled to a full accounting of the Attorney Defendants and MYZIVA's income, dividends, bonuses, expenses, benefits and other profits and monies Defendants received, in connection with MYZIVA, for their own benefit and to the detriment of Plaintiffs, including, without limitation, an accounting of the defendants' profits and for damages in an amount to be determined at trial but in no event less than the sum of $600,000, together with interest thereon and punitive damages.

88.   Plaintiffs have no adequate remedy at law.

14

JAK/D732681v2/M056348/C0151240

**WHEREFORE**, Plaintiffs request that judgment be entered against the Defendants, as follows:

i.      On the First Cause of Action, awarding plaintiff Scott Morrell compensatory damages against MYZIVA and Abrams and Fensterman, personally, in an amount to be determined at trial, but in no event less than the sum of $400,000, together with interest thereon;

ii.     On the Second Cause of Action, awarding Plaintiffs compensatory damages against the Attorney Defendants and MYZIVA in an amount to be determined at trial, but in no event less than the sum of $200,000.00, together with interest thereon;

iii.    On the Third Cause of Action, awarding Plaintiffs compensatory damages against the Attorney Defendants in an amount to be determined at trial, but in no event less than the sum of $600,000, together with interest thereon and punitive damages;

iv.    On the Fourth Cause of Action, awarding Plaintiffs compensatory damages against the Attorney Defendants in an amount to be determined at trial, but in no event less than the sum of $600,000, together with interest thereon and punitive damages;

v.     On the Fifth Cause of Action, awarding Plaintiffs compensatory damages against the Attorney Defendants in an amount to be determined at trial, but in no event less than the sum of $600,000, together with interest thereon and punitive damages;

vi.    On the Sixth Cause of Action, an accounting by Plaintiffs of the Attorney Defendants and MYZIVA's income, dividends, bonuses, expenses and other profits and monies Defendants received in connection with MYZIVA for their benefit, and a judgment for Plaintiffs awarding compensatory damages against the defendants in an amount to be determined at trial, but in no event less than the sum of $600,000, together with interest thereon and punitive damages.

15

vii.     On all Causes of Action, costs, disbursements and attorneys' fees of this action.

Dated: Garden City, New York
        December 1, 2010

                                        JASPAN SCHLESINGER LLP
                                        *Attorneys for Plaintiffs*

                            By:

                                        STEVEN R. SCHLESINGER
                                        300 Garden City Plaza
                                        Garden City, New York 11530
                                        (516)746-8000

16

JAK/D732681v2/M056348/C0151240

## VERIFICATION

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NASSAU       )

**SCOTT MORRELL**, being duly sworn, deposes and says:

I am one of the plaintiffs in the above-entitled action.  I have read the foregoing **AMENDED VERIFIED COMPLAINT** and know the contents thereof; and the same is true to my knowledge, except as to the matters therein stated to be alleged upon information and belief and, as to those matters, I believe them to be true.  The basis of my knowledge is the books and records of the Plaintiffs and/or personal knowledge.

_____
SCOTT MORRELL

Sworn to before me this
____ day of December, 2010.

_____
Notary Public

JARED KASSCHAU
NOTARY PUBLIC STATE OF NEW YORK
No: 02KA6169721
Qualified in New York County
My Commission Expires June 25, 20__

EXHIBIT D

 **MENDES**          NEW YORK          NEWARK          LOS ANGELES          WWW.MENDES.COM

Dana Cavallaro
Associate
212.261.8547
dana.cavallaro@mendes.com

October 21, 2010

**VIA U.S. MAIL & EMAIL**
Howard Fensterman, Esq.
Managing Partner
Abrams, Fensterman, Fensterman, Eisman,
Greenberg, Formato & Einiger LLP
1111 Marcus Avenue, Suite 107
Lake Success, NY 11042

       Re:      Underwriters at Lloyd's, London
                 Lawyers Professional Liability Insurance
                 Policy Number: B0738HI003000E
                 Policy Period: January 1, 2010 to January 1, 2011
                 Insured: Abrams, Fensterman, Fensterman, Eisman, Greenberg,
                 Formato & Einiger LLP
                 Claimants: Jan Burman, Steven Krieger & Scott Morrell
                 Our File: 401,309

Dear Mr. Fensterman:

      Thank you for your responses to our previous inquiries. Based on a review of the information provided to date, we must respectfully advise that our clients, the captioned Underwriters, have concluded that no coverage is available to your firm or its individual attorneys for the captioned claim under several provisions of your policy detailed below.

      We refer you to the Insuring Agreements, Section IA, and Definition of Insured, Section II(C), of your firm's policy, which state in pertinent part:

I              Insuring Agreements

....

     A      Coverage

              To pay on behalf of the Insured, Damages and Claims Expenses which the Insured shall become legally obligated to pay because of any Claim or Claims, including Claim(s) for Related Injury as hereafter defined, first made against the Insured and reported to the Underwriters during the Period of Insurance or Extended Reporting Period, arising out of any act, error or omission of the Insured in rendering or failing to render professional services for others in the Insured's

capacity as a lawyer, fiduciary, arbitrator, mediator or notary public, but solely for acts on behalf of the Named Insured designated in Item 1 of the Declarations and caused by the Insured, except as excluded or limited by the terms, conditions and exclusions of this Policy.

....

II          Definition of Insured

Each of the following is an Insured under this insurance to the extent set forth below:

....

C          any lawyers who are partners in the Named Insured including any incorporated partners and their shareholders but solely for acts on behalf of the Named Insured...

Your letter of July 30, 2010 confirmed that your firm "did not represent any of the claimants with regard to their investment in [American Gulf Insurance Company, LLC]". Your July 30 letter also advised that your firm never rendered legal advice, nor did your firm participate in any manner as attorneys, with regard to claimants' investment in American Gulf Insurance Company, LLC ("AGIC"). As your firm rendered no professional services to AGIC or other named entities, American Gulf Management Company ("AGMC"), Gateway Insurance, LC ("Gateway"), JORDSTAC LLC or the Platinum Group, it appears that none of the acts, errors or omissions alleged by claimants against you could have been undertaken on behalf of your firm because each allegation arises out of activities related to these entities. Finally, your letter indicates that your firm "did not represent any of the claimants with regard to their investment in AGIC, hence, there are no invoices for fees generated with regard thereto." As the acts alleged by claimants were not on behalf of the firm, they are not covered by the Insuring Agreements of your firm's policy. Accordingly, coverage is not available pursuant to section I(A).

We next refer you to Exclusion IV(F) of your policy, which states in pertinent part:

IV          Exclusions

The coverage under this insurance does not apply to Damages or Claims Expenses incurred with respect:

....

F          to any Claim arising out of an Insured's activities as a trustee, partner, officer, director or employee of any employee trust, charitable organization, corporation, company or business other than that of the Named Insured;

As claimants' allegations arise out of your and Robert Fensterman's activities as either trustee, partner, officer, director or employee of AGIC, AGMC and JORDSTAC, LLC, and not out of any professional services rendered as attorneys at your firm, coverage is unavailable pursuant to Exclusion IV(F).

We further direct your attention to Exclusion IV(G) of your policy, which states in pertinent part:

Our File: 401,309                    Page 3 of 3

IV                    Exclusions

The coverage under this insurance does not apply to Damages or Claims Expenses incurred with respect:

....

G        to any Claim made by or against or in connection with any business enterprise...which is owned by any Insured or which is directly or indirectly controlled, operated or managed by any Insured in a non-fiduciary capacity; however this Exclusion only applies to any Claims made by or against any business enterprise in which an Insured has an ownership interest equal to or greater than:

....

(1)      5% of the issued and outstanding voting stock of the shares in any business enterprise which is publicly traded; or

(2)      10% if the shares in the business enterprise are closely or privately held...

....

In your email of September 14, 2010, you confirmed that your membership interest in AGMC, the management company of AGIC, was 25%, and that you and your family are the sole owners of JORDSTAC LLC, a co-defendant in this matter. Your membership interest in AGMC and JORDSTAC LLC, precludes coverage under Exclusion IV(G) as claimants' allegations against you and your firm are in connection with AGIC, AGMC and JORDSTAC LLC, entities which you owned, directly or indirectly controlled, operated and/or managed.

Should you have any additional information that you believe may impact Underwriters' denial of coverage for this claim, please provide it to us as soon as practicable.

We trust you appreciate that our actions and inquiries are without prejudice to any rights or defenses specifically reserved or otherwise generally available to our clients, Underwriters at Lloyd's, London.

Very truly yours,

MENDES & MOUNT, LLP

By: Dana L Cavallaro

Dana L. Cavallaro

EXHIBIT E

# MENDES

NEW YORK          NEWARK          LOS ANGELES          WWW.MENDES.COM

October 21, 2010

Heidi H. Roll
Associate
212.261.8344
heidi.roll@mendes.com

**VIA U.S. MAIL & EMAIL**
Howard Fensterman, Esq.
Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger LLP
1111 Marcus Avenue, Suite 107
Lake Success, NY 11042

> Re:     Underwriters at Lloyd's, London
>          Lawyers Professional Liability Insurance
>          Policy Number: B0738HI003000E
>          Policy Period: January 1, 2010 to January 1, 2011
>          Insured: Abrams, Fensterman, Fensterman, Eisman, Greenberg,
>              Formato & Einiger LLP
>          Claimants: Scott and Roselee Morrell
>          Our File: 401,616

Dear Mr. Fensterman:

Thank you for your responses to our recent inquiries regarding the background of this claim arising out of insured attorneys Robert Abrams, Patrick Formato, Howard Fensterman and Robert Fenstermans' interests and solicitations of investments into MZ National, LLC, Golden Goslings, Inc., and MZ Consulting Company, LLC (collectively "MYZIVA"). Based on a review of the information provided to date, we must respectfully advise that our clients, the captioned Underwriters, have concluded that no coverage is available to your firm or its individual attorneys for the captioned claim under several provisions of your policy detailed below.

We refer you to the Insuring Agreements, Section IA, and Definition of Insured, Section II(C), of your firm's policy, which agree in pertinent part:

I               Insuring Agreements
....
        A       Coverage

To pay on behalf of the Insured, Damages and Claims Expenses which the Insured shall become legally obligated to pay because of any Claim or Claims, including Claim(s) for Related Injury as hereafter defined, first made against the Insured and reported to the Underwriters during the Period of Insurance or Extended Reporting Period, arising out of any act, error or omission of the Insured in rendering or failing to render professional services for others in the Insured's capacity as a lawyer, fiduciary, arbitrator, mediator or notary public, but solely for acts on behalf of the Named Insured designated in Item 1 of the Declarations and caused by the Insured, except as excluded or limited by the terms, conditions and exclusions of this Policy.

....

II          Definition of Insured

Each of the following is an Insured under this insurance to the extent set forth below:

....

C           any lawyers who are partners in the Named Insured including any incorporated partners and their shareholders but solely for acts on behalf of the Named Insured...

Your e-mail of October 12, 2010 confirmed that "there was no legal services provided to either Scott or Roselee with respect to MYZIVA." As your firm rendered no professional services to the claimants with respect to their investment in MYZIVA, it appears that none of the acts, errors or omissions alleged by claimants against you could have been undertaken on behalf of your firm because each allegation arises out of activities related to MYZIVA. As the acts alleged by claimants were not professional services rendered on behalf of the firm, they are not covered by the Insuring Agreements of your firm's policy. Accordingly, coverage is not available pursuant to section I(A).

We next refer you to Exclusion IV(F) of your policy, which states in pertinent part:

IV          Exclusions

The coverage under this insurance does not apply to Damages or Claims Expenses incurred with respect:

....

F           to any Claim arising out of an Insured's activities as a trustee, partner, officer, director or employee of any employee trust, charitable organization, corporation, company or business other than that of the Named Insured;

According to the complaint, Robert Abrams was the President of MYZIVA. Based on this allegation, on the fact that you, Robert Abrams, Patrick Formato and Robert Fensterman collectively hold a 100% interest in MYZIVA, and on your confirmation by email of October 18, 2010 that, with respect to director or officer positions, "We never had any formality, but I suspect that we all were," it appears that you, Robert Abrams, Patrick Formato and Robert Fensterman were either trustees, partners, officers, directors or employees of MYZIVA. As claimants' allegations arise out of the activities of Robert Abrams, Patrick Formato, Robert Fensterman and/or you activities as either trustee, partner, officer, director or employee of MYZIVA, and not out of any professional services rendered as attorneys at your firm, coverage is unavailable pursuant to Exclusion IV(F).

We further direct your attention to Exclusion IV(G) of your policy, which states in pertinent part:

IV    Exclusions

The coverage under this insurance does not apply to Damages or Claims Expenses incurred with respect:

....

G    to any Claim made by or against or in connection with any business enterprise...which is owned by any Insured or which is directly or indirectly controlled, operated or managed by any Insured in a non-fiduciary capacity; however this Exclusion only applies to any Claims made by or against any business enterprise in which an Insured has an ownership interest equal to or greater than:

....

(1)    5% of the issued and outstanding voting stock of the shares in any business enterprise which is publicly traded; or

(2)    10% if the shares in the business enterprise are closely or privately held...

....

In our telephone call on October 14, 2010, Robert Abrams confirmed that he, Patrick Formato, Robert Fensterman and yourself each held a 25% ownership interest in MYZIVA. These ownership interests preclude coverage under Exclusion IV(G) as claimants' allegations against your firm are in connection with MYZIVA, entities which you owned, directly or indirectly controlled, operated and/or managed.

Should you have any additional information that you believe may impact Underwriters' denial of coverage for this claim, please provide it to us as soon as practicable.

We trust you appreciate that our actions and inquiries are without prejudice to any rights or defenses specifically reserved or otherwise generally available to our clients, Underwriters at Lloyd's, London.

Very truly yours,

MENDES & MOUNT, LLP

By: _____

Heidi H. Roll

# AFFIDAVIT OF MAILING

STATE OF NEW YORK )
                  ) ss.:
COUNTY OF NASSAU  )

I, CAMI NEGUS being duly sworn say:

I am not a party to the action, am over 18 years of age and reside in Roslyn Heigths, New York.

On February 17, 2011 I served the within **AMENDED VERIFIED COMPLAINT** by depositing a true copy of same, securely enclosed in a post-paid wrapper, addressed to the parties named below at the address shown, in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State, addressed to each of the following persons, being parties interested in this proceeding, by mail at their last known address, to wit:

Frederick J. Wilmer, Esq.
Kissel, Hirsch & Wilmer
Attorneys for Defendant
580 White Plains Road
5th Floor
Tarrytown, New York 10591
(914) 750-5933

CAMI NEGUS

Sworn to before me on this
17th day of February, 2011

Notary Public

**JOETTA KLOEPPING**
**Notary Public, State of New York**
No. 30-4764166
**Qualified in Nassau County County**
**Commission Expires March 30, 2014**