UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ABRAMS, FENSTERMAN, FENSTERMAN,
EISMAN, GREENBERG, FORMATO
& EINIGER, LLP,

                   Plaintiff,          MEMORANDUM AND ORDER

   -against-                              CV 11-0665 (LDW) (WDW)

UNDERWRITERS AT LLOYD'S, LONDON,

                   Defendant.
----------------------------------------------------------X
Wexler, J.

       Plaintiff Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP (the "Abrams Firm") brings this action against defendant Underwriters at Lloyd's, London ("Lloyd's") for, *inter alia*, a declaration that Lloyd's is obligated to defend and (potentially) indemnify the Abrams Firm in certain underlying actions against the firm pursuant to a professional liability insurance policy (the "Policy") with Lloyd's. The parties cross-move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure ("FRCP"). For the reasons below, the Court grants summary judgment to Lloyd's and denies summary judgment to the Abrams Firm.[1]

## I. BACKGROUND

A. The Burman Action

       In or about June 2010, Jan Burman, Steven Krieger and Scott Morrell (the "Burman Plaintiffs") commenced an action in Delaware Chancery Court (the "Burman Action") against

---

[1] Although oral argument has been requested, the Court finds that oral argument is not necessary to its determination.

various defendants (the "Burman Defendants"), including the Abrams Firm and its managing partner, Howard Fensterman, Esq. ("Fensterman"). The original complaint contained the following "causes of action": (1) breach of fiduciary duty; (2) aiding and abetting breach of the fiduciary duty; (3) malpractice; (4) breach of contract; (5) breach of contract; (6) unjust enrichment; (7) fraud in the factum; (8) fraud in the inducement; (9) negligent misrepresentation; (10) conversion; (11) aiding and abetting conversion; (12) constructive trust; (13) violations of 18 U.S.C. §§ 1961 *et seq*. ("RICO"); (14) RICO conspiracy; and (15) an accounting (the "Burman Complaint"). Fensterman was named in all claims, and the Abrams Firm was named in most but not all. As alleged, the claims arose out of the Burman Defendants' fraudulent scheme to induce the Burman Plaintiffs to invest in a Delaware limited liability company, American Gulf Insurance, LLC ("AGIC"), whose primary business purpose was to underwrite and sell personal and commercial insurance coverage. The Burman Defendants misappropriated the Burman Plaintiffs' funds and concocted an absurd story that the funds were stolen by members of a royal family in the United Arab Emirates ("UAE").

In or about October 2007, Fensterman solicited the Burman Plaintiffs to purchase membership interests in AGIC, and represented that AGIC would be created to operate as an insurance company in the UAE. Fensterman was a founding member and managing director of AGIC, as well as a principal of Jordstac, LLC – a named defendant which was also a founding member of AGIC. Several of the Abrams Firm's other partners also held interests in AGIC. Fensterman also was a founding member and holder of a 25% interest in American Gulf Management Company, LLC ("AGMC"), which was formed to manage AGIC. Fensterman stated to the Burman Plaintiffs that he had partnered with other Burman Defendants, including

Michael J. Weinberg ("Weinberg"), who had experience in the insurance industry, and Amer and Azzam Rustom, who had ties in the UEA that would facilitate AGIC's operations and licensing requirements. Fensterman purportedly traveled to the UAE with Weinberg – a founding member and managing director of AGIC and managing member and holder of a 25% interest in AGMC – to explore potential business opportunities for AGIC.

Thereafter, Fensterman induced the Burman Plaintiffs to wire a total of $1,600,000 to the Abrams Firm's IOLA account in December 2007 and July 2008 in connection with their investments in AGIC, and the Burman Plaintiffs executed AGIC "Subscription Agreements for Investor Membership Interests" in July and August 2008 regarding their investments. By the end of 2009, the Burman Plaintiffs learned that the funds they had invested in AGIC had been misappropriated. Fensterman allegedly made numerous false representations and omissions in connection with the Burman Plaintiffs' investments in AGIC and regarding the misappropriation of their funds.

The Burman Plaintiffs alleged that they relied on Fensterman and the Abrams Firm for legal advice and counsel regarding investing in AGIC. In particular, they alleged that they executed the AGIC subscription agreements "upon the advice of Fensterman, as [their] attorney," which agreements were countersigned by Fensterman "on behalf of AGIC." Burman Complaint ¶¶ 82-84. The malpractice claim, the third cause of action, alleged that Fensterman and the Abrams Firm committed malpractice by, *inter alia*: (1) failing to conduct requisite due diligence before and after the Burman Plaintiffs' investments in AGIC; (2) failing to review and investigate the documents issued in connection with the Burman Plaintiffs' investments in AGIC; (3) failing to adequately disclose Fensterman's and the Abrams Firm's interests in AGIC; (4) failing to

obtain a waiver of conflict of interest from the Burman Plaintiffs relating to Fensterman's and the Abrams Firm's interests in AGIC; (5) failing to protect the Burman Plaintiffs' investments in AGIC; (6) failing to disclose to, and concealing from, the Burman Plaintiffs the loss of the Burman Plaintiffs' investments in AGIC; and (7) failing to perform their professional duties as the Burman Plaintiffs' attorneys and to ensure the accuracy of documents governing the Burman Plaintiffs' investments in AGIC. Similarly, the fourth cause of action, for breach of contract, alleged that the Burman Plaintiffs invested monies in AGIC in reliance and upon the consultation and advice of Fensterman and the Abrams Firm and that Fensterman and the Abrams Firm breached their promise to provide legal services in furtherance of the Burman Plaintiffs' best interests with the requisite skill and care.

The Burman Plaintiffs amended their complaint three times, the first time on December 3, 2010.

B. The Morrell Action

In or about August 2010, Scott and Roselee Morrell (the "Morrell Plaintiffs") commenced an action in New York Supreme Court (the "Morrell Action") against various defendants, including the Abrams Firm and its partners, Fensterman and Robert Abrams, Esq. ("Abrams"). The original complaint contained the following "causes of action": (1) breach of contract; (2) breach of contract; (3) breach of fiduciary duty; (4) malpractice; (5) fraud in the inducement; and 6) an accounting (the "Morrell Complaint"). Abrams, Fensterman, and the Abrams Firm were named in all six claims.

The claims arose out of the Morrell Plaintiffs' loan to, and investments in, defendants The Golden Goslings, Inc. d/b/a MYZIVA ("Golden Goslings"), MZ Consulting Company, LLC,

and MZ National, LLC (collectively, "MYZIVA"). As alleged, MYZIVA offered internet-based products and information relating to the nursing home industry to caregivers and consumers. Abrams was alleged to be "of counsel" to the Abrams Firm and the president of the MYZIVA companies. The Morrell Plaintiffs alleged that Abrams, Fensterman, and the Abrams Firm solicited and fraudulently induced Scott Morrell to make a $400,00 loan to MYZIVA at a time when they knew that MYZIVA had no intent to satisfy the loan, and then they misappropriated the funds from the loan. The Morrell Plaintiffs further alleged that Abrams, Fensterman, and the Abrams Firm fraudulently induced each of the Morrell Plaintiffs to make a $100,000 investment in MYZIVA, and then they induced both of the Morrell Plaintiffs to agree to a "Share Abandonment Agreement" – which extinguished and assigned all of the Morrell Plaintiffs' rights, title, and interest in Golden Goslings back to Golden Goslings – for nominal consideration and by falsely promising Scott Morrell 10% of the profits in Golden Goslings. The stock purchase agreement and shareholder abandonment agreement executed by Scott Morrell were attached to the Morrell Complaint. Abrams executed the stock purchase agreement as president of each of the MYZIVA companies. Similarly, Abrams executed the shareholder abandonment agreement as president of Golden Goslings. According to the Morrell Plaintiffs, Abrams, Fensterman, and the Abrams Firm engaged in this fraudulent conduct in an effort to stave off significant personal financial loss.

      The Morrell Plaintiffs alleged that Abrams, Fensterman, and the Abrams Firm were Scott Morrell's legal counsel in connection with the loan, and that they made their investments in MYZIVA upon the advice and counsel of Abrams, Fensterman, and the Abrams Firm. The malpractice claim, the fourth cause of action, alleged that Abrams, Fensterman, and the Abrams

Firm committed malpractice by, *inter alia*: (1) failing to adequately advise the Morrell Plaintiffs in connection with the Morrell Plaintiffs' investments in MYZIVA; (2) breaching their fiduciary obligations to the Morrell Plaintiffs by inducing the Morrell Plaintiffs to abandon their rights, title, and interest in Golden Goslings for no consideration and in furtherance of Abrams, Fensterman. and the Abrams Firm's personal benefit; and (3) breaching their fiduciary duty by putting their own interests ahead of the Morrell Plaintiffs' interests.

The Morrell Plaintiffs amended their complaint on December 1, 2010.

C. The Policy

The Policy provides coverage for "Damages" and "Claims Expenses" that

> [t]he Insured shall become legally obligated to pay because of any Claim or Claims . . . first made against the Insured and reported to [Lloyd's] during the Period of Insurance or Extended Reporting Period, arising out of any act, error or omission of the Insured in rendering or failing to render professional services for others in the Insured's capacity as a lawyer, fiduciary, arbitrator, mediator or notary public, but solely for acts on behalf of the Named Insured designated on Item 1 of the Declarations and caused by the Insured, except as excluded or limited by the terms, conditions, and exclusions of this policy.

The Policy defines the term "Insured" to include the "Named Insured" designated in Item 1 of the Declarations (*i.e.*, the Abrams Firm), as well as any lawyers who are partners in the Named Insured, "but solely for acts on behalf of the Named Insured." The term "Insured" also includes the following persons, but only to the extent that their acts were "solely . . . on behalf of" the Abrams Firm: lawyers who are "of counsel"; lawyers or other employees (including contract or temporary attorneys) employed by the Abrams Firm; certain persons who "previously qualified as an Insured"; and any lawyer who, during the policy period, becomes a partner, member,

stockholder or employee of the Abrams Firm. The Policy defines "Claim" as "a demand received by any Insured for money or services including the service of suit or institution of arbitration proceedings against the Insured."

There are various exclusions under the Policy, two of which are relevant here. Exclusion IV(F) excludes from coverage "any Claim arising out of any Insured's activities as a trustee, partner, officer, director or employee of an employee trust, charitable organization, corporation, company or business, other than that of the Named Insured." Exclusion IV(G) excludes from coverage

> any Claim made by or against or in connection with any business enterprise (including ownership, maintenance or care of any property in connection therewith), not named in Item 1 of the Declarations, which is owned by any Insured or which is directly or indirectly controlled, operated or managed by any Insured in a non-fiduciary capacity; however, this Exclusion only applies to any Claims made by or against any business enterprise in which an Insured has an ownership interest equal to or greater than:
>
> (1) 5% of the issued and outstanding voting stock of the shares in any business enterprise which is publically traded; or
>
> (2) 10% if the shares in the business enterprise are closely or privately held.

D. Lloyd's Denials of Coverage

The Abrams Firm, through its broker, provided Lloyd's with notice of the Burman Action on or about July 8, 2010 and the Morrell Action on or about September 15, 2010. By separate letters dated October 21, 2010, Lloyd's, through its coverage counsel, Mendes & Mount, LLP, denied coverage for the Burman and Morrell Actions, relying on, *inter alia*, Exclusions IV(F) and IV(G) of the Policy for the denials.

## II. DISCUSSION

### A. Summary Judgment Standard

To obtain summary judgment under FRCP 56, the party seeking judgment must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir. 1987). The burden of showing the absence of a genuine dispute as to any material fact rests on the party seeking summary judgment. *McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir. 1997).

### B. Scope of the Duty to Defend and Indemnify

When determining whether an insurer has a duty to defend a particular action, the court focuses on the four corners of the underlying complaint. The duty to defend exists unless " 'there is no possible factual or legal basis on which the insurer will be obligated to indemnify the insured.' " *United States Underwriters Ins. Co. v. Falcon Constr. Corp.*, No. 02 CV 4179 (BSJ), 2004 WL 1497563, at *5 (S.D.N.Y. July 1, 2004) (quoting *Napoli, Kaiser & Bern, LLP v. Westport Ins. Corp.*, 295 F. Supp. 2d 335, 338 (S.D.N.Y. 2003)). If claims asserted in the underlying action can be said to "rationally" fall within coverage of the policy at issue, there is an obligation to defend. *Seaboard Sur. Co. v. Gillette Co.,* 486 N.Y.S.2d 873 (N.Y. 1984); *see also U.S. Underwriters Ins. Co. v. Congregation Kollel Tisereth Tzvi,* No. 99-CV-7398 DGT, 2004 WL 2191051, *4 (E.D.N.Y. Sept. 30, 2004) (stating that insurer bears "heavy burden of demonstrating that there is no reasonable possibility of coverage under the policy" (quotations omitted)). Similarly, where an exclusion is claimed, the insurer must show that the allegations in the underlying complaint fall "solely and entirely" within an unambiguous exclusion from the

policy's coverage. *U.S. Underwriters Ins. Co. v. 203-211 West 145th St. Realty Corp.,* No. 99 CIV. 8880 (WHP), 2001 WL 604060, at *4 (S.D.N.Y. May 31, 2001). If any exclusion applies, there will be no coverage. *See Maroney v. New York Cent. Mut. Fire Ins. Co.*, 805 N.Y.S.2d 533, 535 (N.Y. 2005). The burden of showing no duty to defend is on the insurer, and that burden is high. *Falcon Constr. Co.,* 2004 WL 1497563, at *5; *Congregation Kollel Tisereth Tzvi*, 2004 WL 2191051, at *4. The duty to indemnify is narrower and exists only after a determination that the "loss, as established by the facts, is covered by the policy." *Atlantic Mut. Ins. Co. v. Terk Techs. Corp.,* 763 N.Y.S.2d 56, 60 (1st Dep't 2003).

C. Coverage of the Burman and Morrell Actions

The Abrams Firm argues that the claims in the Burman and Morrell Actions fall within the scope of coverage under the Policy, in that each of the underlying actions includes, on its face, covered claims – namely, those sounding in legal malpractice. Lloyd's argues, *inter alia*, that even if any of those claims fall within the scope of the Policy, they are expressly excluded from coverage. In this respect, Lloyd's argues that notwithstanding the claims sounding in legal malpractice, all claims in the underlying actions are barred by Exclusions IV(F) and IV(G) – so-called "business pursuit exclusions" and "business enterprise exclusions."

In determining whether the exclusions apply, the Court finds instructive the First Circuit's decision in *Mt. Airy Ins. Co. v. Greenbaum*, 127 F.3d 15 (1st Cir. 1997). There, the First Circuit concluded that an exclusion, similar to Exclusions IV(F) and IV(G), excluded coverage for all claims, including legal malpractice claims. The court held that the subject business enterprise exclusion "precludes coverage for *any* claim which arises out of or in connection with a business venture controlled, operated or managed by *any* Insured or in which the Insured has an interest as

an owner or partner. This includes all claims sounding in malpractice if the allegations charge wrongdoing in connection with a business in which the Insured has such an interest." *Mt. Airy Ins.*, 127 F.3d at 20 (emphasis in original). As the court explained:

> [The insureds'] argument that the duty to defend is triggered by allegations of legal malpractice misses the mark. [The subject exclusion] does not even come into play unless the allegations charge legal malpractice because coverage under the policy is limited to malpractice. "There will always be an attorney-client relationship when these exclusions are at issue. Absent an attorney-client relationship, the insuring agreement does not apply and the language of the specific exclusions does not come into play. [The insureds'] contention would create an illogical result; the policy exclusions would be rendered entirely meaningless and of no effect."

*Id*. (quoting *Senger v. Minnesota Lawyers Mut. Ins. Co.*, 415 N.W.2d 364, 368 (Minn. App. 1987)). Indeed, one of the recognized purposes of a business enterprise exclusion is " 'to avoid circumstances where an insured so intermingles his business relationships with his law practice that an insurance carrier incurs additional risk of having to cover the insured for legal malpractice claims relating to the conduct of business, rather than solely out of the professional practice.' " *Admiral Ins. Co. v. Adges*, No. 11 Civ. 8289 (JPO), 2012 WL 2426541, at *2 (S.D.N.Y. June 27, 2012) (quoting *Jeffer v. Nat'l Union Fire Ins. Co.*, 703 A.2d 316, 322 (N.J. Super. Ct. 1997)).

Under the reasoning in *Mt. Airy*, the claims sounding in legal malpractice and the allegations of an attorney-client relationship between the Abrams Firm and the Burman and Morrell Plaintiffs do not preclude applicability of the Policy's business enterprise exclusions. Indeed, a business enterprise exclusion "does not come into play" absent an alleged attorney-client relationship. *Id.*

Exclusion IV(F) excludes from coverage "any Claim arising out of any Insured's activities as a trustee, partner, officer, director or employee of an employee trust, charitable organization, corporation, company or business, other than that of the Named Insured." The phrase "arises out of" is not defined in the Policy. However, the phrase is commonly interpreted to mean "originating from, incident to, or having connection with." *See Maroney*, 805 N.Y.S.2d at 535; *Atlantic Cas. Ins.*, 585 F. Supp. 2d at 326; *see also Mt. Airy Ins.*, 127 F.3d at 20 (holding that provision excluding coverage for "*any* claim which arises out of or in connection with a business venture controlled, operated or managed by *any* Insured or in which the Insured has an interest as an owner or partner," extends to "all claims in connection with the conduct of an Insured's business entities"). Given that the exclusion applies to "any Claim," even claims sounding in legal malpractice may be barred from coverage provided a sufficient relationship exists between the underlying claim and the insured's conduct. *See Maroney*, 805 N.Y.S.2d at 535; *Atlantic Cas. Ins.*, 585 F. Supp. 2d at 326; *see also Mt. Airy Ins.*, 127 F.3d at 20. Moreover, on its face, the exclusion applies whether or not the insured's activities as a "trustee, partner, officer, director or employee" of a business also constitute or involve professional services.

Upon consideration, the Court concludes that all claims alleged in the Burman Action "arise out of" Fensterman's activities as a "trustee, partner, officer, director or employee" of AGIC and AGMC, the entity that managed AGIC. Fensterman's conduct is alleged to have been part of the fraudulent scheme to induce plaintiffs to invest in AGIC and to misappropriate those funds, notwithstanding that the Burman Plaintiffs also alleged an attorney-client relationship and that they acted "upon the advice of Fensterman, as [their] attorney," Burman Complaint ¶¶ 82-84. The allegations of the Burman Complaint demonstrate that all of the claims have a sufficient

causal connection with Fensterman's conduct relating to AGIC and AGMC. Accordingly, all claims in that action are barred by Exclusion IV(F).

As for the Morrell Action, all claims in that action "arise out of" Abrams' activities as a "trustee, partner, officer, director or employee" of the MYZIVA companies. All of the claims have a sufficient causal connection with Abrams' conduct relating the MYZIVA companies. Indeed, Abrams executed the stock purchase agreement as president of each of the MYZIVA companies and the shareholder abandonment agreement as president of Golden Goslings. Accordingly, based on the Morrell Complaint, all claims in that action are barred by Exclusion IV(F).

Given that Exclusion IV(F) applies, it is unnecessary to determine whether Exclusion IV(G) also applies. Nevertheless, like Exclusion IV(F), Exclusion IV(G) applies to "any Claim," and, therefore, would include claims sounding in legal malpractice. The Burman Action is barred by Exclusion IV(G), as (1) all claims in that action are "against or in connection with" AGIC and/or AGMC; (2) Fensterman was a member of, and held a 25% interest in, AGMC, and he was a founding member and managing director of AGIC; and (3) Fensterman participated in the "control, operation and management" of AGIC in a non-fiduciary capacity. Thus, based on the Burman Complaint, all claims in that action are barred by Exclusion IV(G).

As for the Morrell Action, all claims in that action are against or in connection with MYZIVA, and Abrams, as president of the MYZIVA companies, was involved in the "control, operation and management" of the MYZIVA companies in a non-fiduciary capacity. Although the Morrell Complaint did not allege whether Abrams or Fensterman held ownership interests – controlling or otherwise – in MYZIVA, the October 21, 2010 declination letter references that


Abrams informed Lloyd's and/or its coverage counsel that Abrams held a 25% interest in MYZIVA (and that Fensterman and two other Abrams Firm partners held 25% each).[2] This extrinsic information does not contradict any of the allegations in the Morrell Action and arguably does not even bear on the merits of the claims therein, but it is relevant to the applicability of Exclusion IV(G). As such, the information properly was considered in Lloyd's determination and supports the application of Exclusion IV(G). Thus, all claims in the Morrell Action are barred by Exclusion IV(G).[3]

Accordingly, the Court concludes that Lloyd's denials of coverage were supported by the Burman and Morrell Complaints. Therefore, Lloyd's does not owe the Abrams Firm a duty to defend or indemnify in the Burman and Morrell Actions. Accordingly, the Court grants summary judgment to Lloyd's and denies summary judgment to the Abrams Firm.

## III. CONCLUSION

For the above reasons, the Court grants summary judgment to Lloyd's and denies summary judgment to the Abrams Firm. The Clerk of Court is directed to enter judgment for

---

[2] Notably, paragraph 22 of the amended complaint, dated December 3, 2010, alleged that Fensterman and Abrams maintain a controlling interest in MYZIVA.

[3] This result is consistent with one of the recognized purposes of a business enterprise exclusion, *i.e.*, avoiding imposing additional risk on an insurer of having to cover the insured for legal malpractice claims relating to the conduct of business, rather than solely out of the professional practice. *See Adges*, 2012 WL 2426541, at *2; *Jeffer*, 703 A.2d at 322. Undoubtedly, an insurance premium is set in reliance on the reasonable expectation that the exclusion would avoid such a risk. To impose a duty to defend and indemnify under the circumstances here would defeat that expectation and the purpose of the exclusions, and likely would cause a significant rise in legal malpractice premiums.

Lloyd's dismissing the action and to close the file.

    SO ORDERED.

                                          _____/s/_____
                                          LEONARD D. WEXLER
                                          UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
       January 2, 2013